IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

---------------------------------------------------- x
In re:                              :        Chapter 11
                                    :
AUSTEX OIL, LTD., et al.,[1]        :        Case No. 19-11138
                                    :
            Debtors.                :        Jointly Administered
----------------------------------------------------x

## JOINT DISCLOSURE STATEMENT SUBMITTED BY DEBTORS

### ARTICLE I.
Introduction

AusTex Oil, Ltd., AusTex Holdco, LLC, International Energy Holding Company, LLC, International Energy, LLC, International Energy Company, LLC, International Energy Corporation, International Properties Partners, LLC, and International Oil & Gas, LLC ("Debtors"), are the proponents ("Proponents") of the Joint Plan of Liquidation of Debtors (the "Plan"), and respectfully submit the Plan dated October 1, 2019, attached hereto as Exhibit "A" for your consideration. Capitalized terms in this Joint Disclosure Statement ("Disclosure Statement"), unless defined herein, shall have the meaning as defined in the Plan. This Disclosure Statement is intended to provide information to all known Creditors and Interest Holders of each of the Debtors for use in deciding how to evaluate the operations and benefits of and how to vote on the Plan. Solicitation of acceptances of a plan is not permitted until a disclosure statement has

---

[1] The Debtors are AusTex Oil, Ltd., Case No. 19-11138-M, AusTex Holdco, LLC, Case No. 19-11139-M, International Energy Holding Company, LLC, Case No. 19-11140-M, International Energy, LLC, Case No. 19-11141-M, International Energy Company, LLC, Case No. 19-11142-M, International Energy Corporation, Case No. 19-11143-M, International Properties Partners, LLC, Case No. 19-11144-M, and International Oil & Gas, LLC, Case No. 19-11145-M. The Court entered an order directing joint administration of these cases on July 12, 2019. The debtors are collectively referred to as "Debtors" herein.

been approved by the Bankruptcy Court. The Bankruptcy Rules and procedures governing solicitation of votes and balloting are described in more detail in Article XII.

## ARTICLE II.
Concept of the Plan

In this Plan, Debtors propose a consolidated Plan for the distribution of all Debtors' funds on hand (approximately $16,500,000) and further liquidation of a limited amount of assets, and use of the resulting proceeds to fund the Plan for the benefit of their Creditors. The Plan does not propose to reorganize Debtors' businesses. The Plan provides for payment of Allowed Administrative Claims within thirty (30) days of the Effective Date or within thirty (30) days of the determination and allowance by the Bankruptcy Court, if determined after the Effective Date, or paid at a later date as may be agreed between Debtor and any Administrative Claimant. Allowed Secured Claims would be paid in accordance with provisions of the Plan. There are no known Secured Claims at this time. Allowed Secured Claims (if any), Allowed Priority Tax Claims of Governmental Units, Allowed Priority Claims, the post-confirmation expenses of administration of the Plan, and Allowed Unsecured Claims, as provided in this Plan, will be paid in full. Allowed Earthquake Claims will be paid $300 per Allowed Claim, and counsel, two law firms, will be paid $25,000 each under the Plan in exchange for dismissal and final settlement of the Earthquake Litigation. The aggregate payment will be capped at $390,000 for holders of Allowed Earthquake Claims and counsel. The treatment for holders of Allowed Earthquake Claims is a settlement and compromise and will be withdrawn absent approval by this Class. Absent approval, the Class will be treated as contingent, disputed, and unliquidated, and subject to allowance by the Bankruptcy Court. The Allowed Preferred Shareholder Claims will be subordinated to Allowed Unsecured Claims and Allowed Earthquake Claims, but under this Plan will receive a *pro rata* payment from remaining funds, estimated to be $15,500,000 in accordance with provisions of the documents

governing such claim.  For purpose of the Plan, Preferred Shares are not considered equity, but are treated as claims because each Preferred Shareholder has made demand for redemption and payment of sums in money due thereunder.  In the absence of any excess funds, the Plan provides no payment for equity.  The amount distributed to Creditors is dependent upon the amount of Allowed Claims after the claim allowance process is completed.

### General Summary of the Plan

The Plan provides for the transfer and vesting of all assets, including cash and claims, in the Debtor. A Liquidating Agent will conduct post-confirmation administration of the Plan, including distribution of payment, for the benefit of Debtors' Creditors holding Allowed Claims. The assets administered by the Liquidating Agent will include cash on hand of approximately $16,500,000, the assignment of all claims held by the Debtors against third parties, and limited remaining assets of the Debtors, not yet liquidated.  The Liquidating Agent will be Richard A. Adrey, who is more particularly described in Article IX of this Disclosure Statement.  The funds of the Estate are currently invested consistent with 11 U.S.C. § 345, and the Liquidating Agent will maintain such investments or deposits  consistent therewith, pending distribution.

Debtors commenced these Chapter 11 Cases on June 3, 2019, in the United States Bankruptcy Court for the Northern District of Oklahoma.  Each Debtor filed a separate voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on that date.  Upon filing, the Debtors began operating as Debtors-in-Possession with all rights, powers, and duties of a trustee in bankruptcy pursuant to §§ 1107 and 1108 of the Bankruptcy Code, and the Cases were ordered jointly administered by the Bankruptcy Court.

The Debtors completed an orderly monetization of assets over the period from October 2017 through January 2019, prior to the commencement of these Cases.  The net sale Proceeds of such sales were as follows:

| Seller | Date of Sale | Buyer | Net Sale Proceeds After Closing Adjustments |
|---|---|---|---|
| International Energy Corporation | 01/22/2019 | SNR Operating of Northern Oklahoma, LLC | $8,171,335.15 |
| International Energy, LLC | 01/22/2019 | SNR Operating of Northern Oklahoma | $5,544,852.38 |
| International Oil & Gas, LLC | 03/05/2018 | The William D. Heldmar Trust Dated Jan. 31, 2006 | $2,986,918.16 |
| **Total Sale Proceeds** | | | **$16,703,105.69** |

The Oklahoma Debtors have monetized substantially all of their respective assets to cash. The only remaining non-cash assets to be liquidated are several items of machinery and equipment of International Energy Company, LLC (estimated value $150,000-$250,000) and real estate owned by International Properties Partners, LLC, in Drumright, Oklahoma (estimated value at $75,000-$100,000 listed on Schedule 1 attached hereto).  The cash proceeds held by Debtors and net proceeds from liquidation of the remaining assets will be utilized to fund payment of respective Administrative Claims and Allowed Claims as provided in the Plan.  None of the Debtors have any operations or employees, and this Plan is not dependent on or affected by the results of any business operations.

The cases have been jointly-administered pursuant to Court Order, so that costs of administration, including professional fees, will be paid by general funds of the Debtors and through pre-petition retainers.

This Plan is a consolidated Plan.  All assets of all Debtors are contributed to the Plan for funding, and all claims against each of the Debtors are likewise consolidated in this Plan.  These

entities, though separate, functioned as an economic unit. The largest group of claims is held by Preferred Shareholders of AusTex Oil. The amount of such claims totals $33,018,882.90 on the Company's books. Each of the Preferred Shareholder Claims are asserted not only against AusTex Oil but also against each of the Oklahoma Debtors in such amount based upon a guaranty obligation. Thus, the Preferred Shareholder Claims are common to all Debtors.

The Plan provides for a process for determination and allowance of claims and groups creditors into classes of common interest for distribution of funds. The Bankruptcy Code provides for priority of payment of claims. Typically, allowed secured claims are entitled to be paid from the proceeds of collateral securing their claims ahead of unsecured claims. There are no known secured creditors in any case of any Debtor.[2] The Debtors anticipate that all Allowed Claims of Creditors will be unsecured claims. However, if a Secured Claim is asserted and becomes an Allowed Secured Claim, it will be paid in accordance with the terms of the Plan.

The aggregate amount of unsecured trade creditors for all Debtors, excluding Preferred Shareholder and Earthquake Claims, is approximately $390,000 and will be paid in full. The Plan also provides settlement of the Earthquake Litigation by payment of $300 to each Claimant and $25,000 each to two law firms representing them in the Earthquake Litigation, in exchange for dismissal of the Earthquake Litigation with prejudice to refiling. The number of Earthquake Claimants is 1,128.

There is a large group of undetermined Claims held by creditors asserting damages, set forth in twenty separate legal actions against one of the Debtors, International Energy Corporation, more fully discussed herein. These claims are referred to as "Earthquake Claims," and constitute

---

[2] Discussed below in the section "March 5th Escrow," are the matters related to the claim of Weider and Forman, which Debtors submit do not constitute a secured claim.

Class 5 Claims. Numerous other oil and gas operators are co-defendants in these actions. These creditors assert claims for alleged damages to their properties from earthquakes which are claimed to have resulted from oil and gas operations. As noted herein, the Debtors have disputed such claims. The cost to defend these actions, including the costs for expert witnesses, will be significant. In addition, a litigated resolution of these twenty civil actions could be time consuming.

The Allowed Claims of Preferred Shareholders (Class 6) will be paid *pro rata* from the remaining distributable funds, estimated to be $15,500,000.

It is unlikely that funds will be available for any distribution to Class 7 Interest holders.

The funds on hand, held in the aggregate by all the Debtors, is $16,500,000. This sum includes $7,309,276 deposited with American Bank and Trust Company pursuant to an Escrow Agreement dated March 5, 2019 ("March 5th Escrow"). The funds on hand, excluding the March 5th Escrow, are as follows:

| Name | Demand Deposit Balance | Funds Deposited in CDARS and ICS Accounts |
|------|------------------------|-------------------------------------------|
| AusTex Oil, Ltd. | $3,408.30 | $0 |
| AusTex Holdco, LLC | $0 | $0 |
| International Energy Holding Company, LLC | $34,554.05 | $376,098.00 |
| International Energy Corporation | $208,861.47 | $3,531,877.99 |
| International Energy Company, LLC | $16,942.00 | $584,173.71 |
| International Energy, LLC | $112,726.64 | $2,842,410.59 |
| International Property Partners, LLC | $6,995.47 | $117,385.96 |
| International Oil & Gas, LLC | $8,697.57 | $1,360,000 |
| **Total** | **$392,185.50** | **$8,811,946.25** |

Interest is earned on the CDRS and ICS Funds deposited, and the Demand Deposit account will vary with usage of funds. These figures are as of September 17, 2019.

2.1.   **Brief History of Debtors Prior to Bankruptcy.**

AusTex Oil was founded in 2007, and was a publicly traded oil and gas company listed on the Australian Securities Exchange under the symbol "AOK." AusTex Oil had previously traded in the United States as American Depositary Receipts under the symbol ATXDY. All public trading has been suspended for AusTex Oil. AusTex Oil operates in the United States through its wholly owned subsidiaries, some held directly and some indirectly.  The entities are sometimes collectively referred to as the "Oklahoma Debtors." Each of the Oklahoma Debtors is organized under the laws of Oklahoma and headquartered in Tulsa, Oklahoma. The following chart depicts AusTex Oil and the Oklahoma Debtors and their relationships to each other.

**Organizational Chart of AusTex Oil and Subsidiaries**



AusTex Oil maintains its offices in Sydney, Australia. It currently has no employees, and its activities are limited to winding up its affairs and those of the Oklahoma Debtors.  AusTex Oil has commenced an action in the federal court of Australia to obtain a determination from the Australian Court that the case of AusTex Oil pending in this Court will be the main case for resolution of claims against AusTex Oil.

AusTex Oil and various of the Oklahoma Debtors have been engaged in marketing and selling of oil and gas assets and interests to monetize Debtors' Assets for the purpose of funding Creditor Claims. The Oklahoma Debtors' business consisted of (1) oil and gas exploration, development, and production primarily from the Mississippian formation in Oklahoma and Kansas, and (2) the operations of owned oil and gas interests. At its zenith, the Oklahoma Debtors had interests in approximately 13,000 net acres, produced oil and gas from approximately 125 wells, and generated 1,300 barrels of oil equivalent per day ("BOE/d").  Oil and gas operations were principally conducted by International Energy Corporation, International Energy Company, LLC, International Energy, LLC, and International Oil & Gas, LLC.  The sale process, authorized by the AusTex Oil Board of Directors and the respective Debtors, has been underway since the fall of 2017. The Oklahoma Debtors have completed marketing and sale of substantially all their oil and gas assets, operating assets, and properties prior to filing these Chapter 11 cases, through an organized arms-length marketing program exposed to the industry with independent professional expertise of Meagher Energy Advisors, a nationally recognized firm, to monetize the assets. The marketing efforts continued through January 2019. Sales of oil and gas operations and oil and gas assets of the Oklahoma Debtors have now been substantially completed. In the aggregate, these divestitures netted approximately $16,700,000.  Those funds substantially remain on hand to fund this Plan.

Each of the Oklahoma Debtors since formation has conducted business as a separate entity, and has maintained a separate corporate identity and governance, separate books and funds, and separate accounting records. A general description of each is as follows:

1.      AusTex Holdco, LLC, is an Oklahoma limited liability company.  AusTex Holdco, LLC, was formed to serve as a "super holding company" for all of its Oklahoma Debtor subsidiaries, directly or indirectly, to permit consolidation of auditing and accounting purposes. The membership interests of AusTex Holdco, LLC, are held 100% by AusTex Oil.  AusTex Holdco, LLC, never maintained employees nor actually engaged in oil and gas operations. It holds no assets other than its direct or indirect membership or stock interest in Oklahoma Debtors and has no assets and has no known creditors other than Preferred Shareholders under its Subsidiary Guarantee of the AusTex Oil debt.

2.      International Energy Holding Company, LLC, is an Oklahoma limited liability company. It was formed to be the holding company that would directly own the outstanding shares of International Energy, LLC, International Energy Company, LLC, and International Energy Corporation, which were each actively operating companies in the oil and gas business. International Energy Holding Company, LLC's membership interests are 100% owned by AusTex Holdco.

3.      International Energy, LLC, is an Oklahoma limited liability company.  It was formed to lease potential drilling locations and own such interests in resulting wells primarily located in Kay County, Oklahoma.  International Energy, LLC's membership interests are 100% owned by International Energy Holding Company, LLC.  International Energy, LLC sold its producing properties to SNR Northern Oklahoma Operating, LLC, in a transaction that closed on October 31, 2018, with final closing on January 22, 2019, which generated proceeds of

$5,544,852.38.  This sale to SNR also included a sale of assets of International Energy Corporation, for which International Energy Corporation received consideration of $8,171,335.15, as discussed below.  International Energy, LLC, owns all outstanding membership interests in International Properties Partners, LLC, and International Oil & Gas, LLC.

4.      <u>International Energy Company, LLC</u>, is an Oklahoma limited liability company.  It was formed to operate certain oil and gas assets which were primarily located in Creek, Kay, Lincoln, and Payne Counties in Oklahoma.  International Energy Company, LLC's membership interests are 100% owned by International Energy Holding Company.

5.      <u>International Energy Corporation</u>, an Oklahoma corporation, was the initial entity formed in 2006. It acquired and operated producing leases and licensed technology in the oil and gas business in Oklahoma.  In March 2007, International Energy Corporation was merged into AusTex Oil, Ltd. for further capitalization and became a wholly owned subsidiary of AusTex Oil. Two affiliates of AusTex Oil, denominated International Energy Corporation of Northern Oklahoma and International Energy Corporation (Kansas), were merged into International Energy Corporation in September 2014.  The stock of International Energy Corporation is held 100% by International Energy Holding Company, LLC.

International Energy Corporation owned and operated approximately half of the total producing assets of the Oklahoma Debtors in 2017 and was bonded and approved to operate in Oklahoma and with the Bureau of Indian Affairs.  It also owned most of the vehicles and oil field equipment used in certain oil and gas operations. International Energy Corporation sold substantially all of its producing Kay County assets and some equipment to SNR Northern Oklahoma Operating, LLC, in a transaction that closed on October 31, 2018, with final settlement occurring on January 22, 2019. Net sale proceeds to International Energy Corporation was

approximately $8,171,335.15.  This sale transaction also included assets of International Energy, LLC, discussed below, for which International Energy, LLC, received an additional sum of $5,544,852.38.

6.    International Properties Partners, LLC, is an Oklahoma limited liability company. It was formed in 2016 to acquire a 50% ownership in a building and certain surface rights in conjunction with the acquisition of properties primarily located in Creek, Lincoln, and Payne Counties in Oklahoma. In March 2018, International Properties Partners, LLC's assets were sold to the William D. Helmar Trust, with the exception of one building in Drumright, Oklahoma, which International Properties Partners, LLC, continues to own.

7.    International Oil & Gas, LLC, is an Oklahoma limited liability company, which was formed in 2016 to acquire a 50% operating interest in leases and other producing properties primarily located in Creek, Lincoln, Payne, Tulsa, and Pawnee Counties in Oklahoma. All of these producing assets along with surface rights (International Properties Partners, LLC) and some equipment were sold in March of 2018, and generated net proceeds of $2,986,918.16.

**Debtors' Capital Structure**

AusTex Oil's capital structure is generally described as follows:

| | |
|---|---|
| Issued and Outstanding Ordinary Shares of Common Stock of AusTex Oil | 563,821,402 Shares |
| Issued and Outstanding Preferred Shares Series A of AusTex Oil, guaranteed by Oklahoma Debtors | 111,212,658 Shares |
| Issued and Outstanding Preferred Shares Series B of AusTex Oil, guaranteed by Oklahoma Debtors | 108,913,225 Shares |

In October 2013, AusTex Oil issued Preferred Shares pursuant to a Subscription Agreement, offered only to accredited investors. The Preferred Shares were sold pursuant to a written Subscription Agreement (including all of the exhibits) which established the rights of

AusTex Oil and holders of such Preferred Shares and were based upon certain representations of the purchasers.

The Preferred Shares initially sold consisted of (1) 58,942,656 Preferred Shares as Series A with an original aggregate purchase price of $8,841,398, and (2) 57,724,011 Preferred Shares as Series B with an original aggregate purchase price of $8,658,602.

Preferred Shares were originally issued to the following, in the following amounts:

| Series A Holder | Number of Shares | Percentage of Ownership |
|---|---|---|
| Ptolemy Energy Holdings | 51,995,234 | 88.2% |
| Young Capital Partners, LP (subsequently transferred to Weider Health & Fitness) | 6,947,422 | 11.8% |

| Series B Holder | Number of Shares | Percentage of Ownership |
|---|---|---|
| Ptolemy Energy Holdings | 46,8771,433 | 81% |
| Young Capital Partners, LP Company | 3,233,334 | 5.6% |
| Weider Health & Fitness – with Young Capital Partners, LP as Agent | 6,161,054 | 11.1% |
| Bruce Forman – with Young Capital Partners, LP as agent | 1,333,333 | 2.3% |

In 2014, AusTex Oil sought to obtain traditional bank funding to permit acquisitions for expansion of its operations. The lender required Preferred Shareholders to release their rights to future dividends on issued Preferred Shares, as a condition of lending. In mid-October 2014, all Preferred Shareholders entered into an identical Amended Deed-Subscription Agreement ("Amended Deed"). The Amended Deed provided for issuance to Preferred Shareholders of an agreed "payment in kind" of additional Preferred Shares. These additional "payment in kind" shares of Preferred Shares (not included in the total above) were issued in exchange for an agreement of each Preferred Shareholder to subordinate claims to prospective bank debt and a

forfeit and release of rights to payment of future dividends on the Preferred Shares, as established in paragraph 4.26(c) of the Amended Deed.

The "payment in kind" Preferred Shares were issued as follows:

| Series A Amended Issue | Number of Shares | Percentage of Ownership |
|---|---|---|
| Ptolemy Energy Holdings | 46,108,848 | 88.2% |
| Young Capital Partners, LP | 0 | 0 |
| Weider Health & Fitness | 6,161,054 | 11.8% |
| Bruce Forman | 0 | 0 |

| Series B Amended Issue | Number of Shares | Percentage of Ownership |
|---|---|---|
| Ptolemy Energy Holdings | 41,476,574 | 81% |
| Young Capital Partners, LP | 2,867,109 | 5.6% |
| Weider Health & Fitness | 5,663,063 | 11.06% |
| Bruce Forman | 1,182,471 | 2.3% |

The holders of Preferred Shares, after issuance of additional "payment in kind" Preferred Shares in October 2014, pursuant to the Amended Deed, held the following Preferred Shares:

| Series A Holder | Number of Shares | Percentage of Ownership |
|---|---|---|
| Ptolemy Energy Holdings, LLC | 98,248,007 | 88.213% |
| Weider Health & Fitness (acquired October 24, 2013, from Young Capital Partners, LP) | 13,108,476 | 11.787% |

| Series B Holder | Number of Shares | Percentage of Ownership |
|---|---|---|
| Ptolemy Energy Holdings, LLC | 88,248,007 | 81.03% |
| Young Capital Partners, LP | 6,100,443 | 5.60% |
| Weider Health & Fitness | 12,048,974 | 11.06% |
| Bruce Forman | 2,515,804 | 2.31% |

The Subscription Agreement provided that AusTex Oil's Oklahoma Debtor subsidiaries would execute and deliver a Subsidiary Guarantee of AusTex Oil's obligations to the holders of Preferred Shares. At the time of issuance of the Preferred Shares, only International Energy

Corporation (together with two other entities later merged into International Energy Corporation) existed. Each provided a Subsidiary Agreement to Preferred Shareholders in October 2013.

Other subsidiaries were formed later in 2014 as part of an internal reorganization largely based on tax considerations. On January 29, 2018, AusTex Holdco, LLC, International Energy Holding Company, LLC, International Energy, LLC, International Energy Company, LLC, International Oil & Gas, LLC, and International Properties Partners, LLC, executed and delivered Subsidiary Guarantees to the Preferred Shareholders. The Plan acknowledges the validity of the Guarantees of the subsidiaries.

On March 23, 2017, Weider Health & Fitness ("Weider") and Bruce Forman ("Forman"), Weider's Executive Vice President, two of the holders of Preferred Stock (Weider owns Series A and B Shares and Forman only Series B), commenced an action in the United States District Court for the Southern District of New York ("District Court") styled *Weider Health and Fitness and Bruce Forman v. AusTex Oil Limited, an Australian entity, International Energy Corporation, an Oklahoma corporation, International Energy Corporation of Northern Oklahoma, and International Energy Corporation (Kansas), a Kansas corporation,* Case No. 17-CV-02089 ("Weider Action"). The Weider Action alleged, among other things, that AusTex Oil had breached the Terms of Issue of the Subscription Agreement because "Key Persons," officers of AusTex Oil, ceased to be employed by AusTex Oil without prior consent of Weider and Forman. The basis for the alleged breach was the removal of one executive and one field supervisor in charge of land preparation, no longer needed by AusTex. Weider and Forman alleged that the removal of such persons without their consent constituted a "Shareholder Redemption Event," which, Weider and Forman asserted, gave them rights to redeem their Preferred Shares for cash. AusTex Oil contended that the plain language of the Terms of Issue did not require the consent of either Weider

or Forman for the cessation of employment of two of the three "Key Persons."  Moreover, the majority Preferred Shareholder, Ptolemy Energy Holdings, LLC, did consent to the cessation of employment of two of the three "Key Persons."  AusTex Oil contended further that, even if the consent of Weider and Forman was required, the Subscription Agreement provided that a Shareholder Redemption Event would not constitute a basis requiring redemption of preferred shares, if the Required Purchaser (Ptolemy Energy Holdings, LLC), as defined in the Subscription Agreement, consented to the action as the majority holder of Preferred Shares.  AusTex Oil and International Energy Corporation thus disputed the claimed default and have vigorously defended the Weider Action.  Litigation of the Weider Action has been expensive to AusTex Oil and International Energy Corporation with legal costs to exceeding $800,000.  That action has been inconclusive.  The Court denied both parties' motions for summary judgment and no claim of Weider and Forman has been determined in the Weider Action.

Preferred Shareholders, Ptolemy Energy Holdings, LLC, and Young Capital Partners, LP, have each submitted a demand of payment of their redemption claims as Preferred Shareholders when a redemption of Preferred Shares did not occur. The total demands of the Preferred Shareholders is estimated to be in excess of $33 million.  All Preferred Shareholders have now demanded redemption of the Preferred Shares, but on differing bases.

### DEBTORS' EFFORTS TO ADDRESS CREDITOR CLAIMS

In an orderly process which spanned a period from October 2017 through January 2019, the Debtors, under management and direction of Richard Adrey, conducted a commercial marketing of their respective oil and gas interests and excess equipment to third party purchasers,

assisted by Meagher Energy Advisors.[3]  Mr. Adrey had been managing the Debtors' various operations since 2007, and is experienced and active in the oil and gas business.  Three major sales were ultimately completed.  Throughout the process, resulting sale proceeds, less operating costs, were set aside to create a fund to address creditor claims, and were not expended.

Upon conclusion of the sales, the Debtors began to determine the most efficient procedure whereby the sale proceeds could be made available to pay Creditor Claims in an orderly proceeding assuring fair distribution to all Creditors.

On January 31, 2019, after careful review of the circumstances, costs, and available options, the Debtors authorized the commencement of a federal court interpleader action in the United States District Court for the Northern District of Oklahoma which Debtors believed to be the proper venue.  The net fund amount was proposed to be deposited pursuant to an interpleader action to pay the Creditor Claims, in accordance with the priority to which each Claim was entitled under the document or transaction creating the Claim.  The goal of this process was to establish one place for all Creditors, in a Federal District Court in Oklahoma where the assets were located, to determine claims, and for the deposit of the accumulated funds of the Debtors, and to place all funds, including those of entities who were not the Weider Defendants, into the court registry. None of the Oklahoma Debtors, except for International Energy Corporation, were before the court in the Weider Action.

---

[3] After these sales, there remain only various and sundry assets that require liquidation, including but not limited to a fifty percent interest in a commercial building located in Drumright, Oklahoma, owned by International Properties Partners, LLC, and certain oil and gas field equipment owned by International Energy Corporation.

Consistently, and in a timely fashion, AusTex Oil and International Energy Corporation advised the District Court and Weider and Forman of the asset sales and of demands made by the other Preferred Shareholders.

On February 12, 2019, AusTex Oil and International Energy Corporation advised the District Court in the Weider Action that their principal assets had been monetized.  The District Court suggested the parties consider mediation.  AusTex Oil and International Energy Corporation were willing to undertake mediation, as was Young Capital Partners, LP and Ptolemy Energy Holdings.  Weider and Forman insisted that the Preferred Shareholder mediation could not provide for a *pari pasu* distribution to all Preferred Shareholders.  In a filing on or about February 19, 2019, AusTex Oil and International Energy Corporation advised the District Court that mediation could not go forward with the pre-condition of Weider and Forman, that *pari pasu* distributions would not be considered in the mediation, and that AusTex Oil and International Energy Corporation were considering initiating a federal court interpleader action in the United States District Court for the Northern District of Oklahoma, naming all creditors and Preferred Shareholders, and depositing all funds into the registry of the Court for a determination of claims in all of the funds.

### NEW YORK DISTRICT COURT ORDER AND ESCROW AGREEMENT

On February 19, 2019, the District Court issued an order ("Escrow Order") which mandated the escrow of funds by AusTex Oil and International Energy Corporation to secure a possible judgment in favor of Weider and Forman without a hearing pursuant to Federal Rules of Civil Procedures.  AusTex Oil and International Energy Corporation complied with the Escrow Order on March 5, 2019, by depositing $7,309,276 (the amount calculated solely by counsel for Weider and Forman and objected to by AusTex Oil and International Energy Corporation) from sale proceeds of International Energy Corporation into the March 5th Escrow with a third-party

financial institution.  The funds transfer, initiated on March 5, 2019, actually credited on March 7, 2019, on the books of American Bank and Trust Company.  Proponents believe that the funds deposited into the March 5th Escrow continue to be property of the Estate, or that the transfer is avoidable under the Bankruptcy Code.

None of the Preferred Shareholder Claims have yet been determined.  If the March 5th Escrow is enforceable, the ultimate result will be that the March 5th Escrow proceeds ($7,309,276 of the approximate $16.5 million aggregate of the Oklahoma Debtors), would be earmarked for Weider's and Forman's recovery on their Preferred Shares.  In such case, approximately 46% of all funds held by the Debtors would be earmarked for claims of Preferred Shareholders whose interests approximate only 11.78% of Series A Preferred Shares (Weider) and 13.37% of Series B Preferred Shares (Weider and Forman) under the March 5th Escrow.  The rights of all Preferred Shareholders arise from common transactions under identical documents and contemporaneous circumstances and as such all are entitled to share in any recovery *pari pasu*, absent specific defenses against any such claim(s).  AusTex Oil and International Energy Corporation immediately filed an appeal in the Second Circuit Court.

Absent the filing of these Chapter 11 cases, the March 5th Escrow would preclude a *pro rata* distribution of funds to all Preferred Shareholders to achieve equality of distribution consistent with the Bankruptcy Code.

Trial in the Weider Action was previously set for December 2019, and would not resolve claims of holders of approximately 85% of the Preferred Shares, nor would it address more than one-half of Debtors' funds available for Creditor distribution from Oklahoma Debtors other than International Energy Corporation.  This Plan addresses all claims against the Debtors and provides a "Global Resolution" for distributions of all of its distributable funds.

Plan Proponents contend that the Weider Action seeks to recover for Weider and Forman a disproportionately large recovery on their claims to the detriment of the Debtors' other Creditors.

Pursuant to the terms of the Subscription Agreement, each holder of Preferred Shares is to receive an amount equal to the number of its Preferred Shares, multiplied by $0.15. Applying the $0.15 amount to the percentage to Preferred Shares held, the Claims, excluding interest, for Preferred Shareholders is as follows:

|  | Total Shares | Amount x .15 Per Share |
|---|---|---|
| Ptolemy Energy Holdings, LLC | 186,352,189 | $27,952,828.90 |
| Weider Health & Fitness | 25,157,450 | $3,773,617.50 |
| Bruce Forman | 2,515,804 | $377,370.60 |
| Young Capital Partners, LP | 6,100,443 | $915,066.45 |
| **Total** | **220,125,886** | **$33,018,883.45** |

The total sum of $7,309,276 deposited into the March 5th Escrow pursuant to the Escrow Order is predicated upon the following asserted claim of Weider and Forman, set forth by counsel to Weider and Forman, and is subject to objection by Debtors:

| Claimant | Claim Amount |
|---|---|
| Weider Health and Fitness – Class A | $1,966,271.40 |
| Weider Health and Fitness – Class B | $1,807,346.10 |
| Bruce Forman – Class B | $377,370.60 |
| **Total Aggregated Claims** | **$4,150,988.10** |

| Aggregated Claims of Weider & Forman | $4,151,076 |
|---|---|
| Accruing Interest through February 21, 2019 | $1,183,200 |
| Additional 18 month interest | $1,000,000 |
| Estimated Attorney Fees Incurred | $475,000 |
| Estimated Additional Attorney Fees | $500,000 |
| **Total** | **$7,309,276.00** |

The aggregated amount of claims of Weider and Forman of $4,151,076 is in accord with the records of AusTex Oil. The interest claim is disputed because the dividend was forfeited by the Amended Deed in consideration of substantial "payment in kind" through issuance of additional Preferred Shares to Weider and Forman, and all other Preferred Shareholders. In

addition, the Amended Deed provided that no dividend would be earned on the "payment in kind" shares.

Pursuant to the Plan, it is proposed that all Preferred Shareholders be paid an initial distribution predicated upon funds available (estimated to be $15,500,000), less the amount of the funds in the March 5th Escrow, which is $8,190,724, based upon the following claim:

| | Claim | Initial Distribution Based on $8,190,724 |
|---|---|---|
| Ptolemy Energy Holdings, LLC | $27,952,883.55 | $6,934,029.32 |
| Weider Health & Fitness | $3,773,617.50 | $936,090.40 |
| Bruce Forman | $377,370.60 | $93,611.24 |
| Young Capital Partners, LP | $915,066.45 | $226,933.04 |
| | **$33,018,938.10** | **$8,190,664.00** |

The funds in the March 5th Escrow will be reserved pending a determination concerning the validity of Weider's and Forman's Claims, as well as their enforceability as against the March 5th Escrow. A second distribution will occur upon determination of those issues. If the March 5th Escrow and the Claims of Weider and Foreman are determined to be valid and enforceable, then this Plan will distribute from the March 5th Escrow Funds such funds as are necessary to fully fund the Weider and Foreman Allowed Preferred Shareholder Claims after credit for payments made in the Initial Distribution to each of them. Any balance remaining in the March 5th Escrow will be distributed *pro rata* to Ptolemy Energy Holdings, LLC, and Young Capital Partners, LP, based upon the amount of their Allowed Claims. If the claims of Weider and Forman in the March 5th Escrow are determined not to be enforceable, then the entire March 5th Escrow will be distributed to all Preferred Shareholders on a *pro rata* basis, after payment in full of all other Creditors.

None of the Preferred Shareholder Claims have been determined. Weider and Forman, in the New York Litigation, seek a determination in that District Court. The automatic stay, pursuant to 11 U.S.C. § 362, precludes continuation of the New York Litigation for that purpose.

Proponents believe that allowance of the Preferred Shares in these cases is more economic, will apply consistent standards, establish claims fairly, and will be substantially less expensive to the Estate if decided in this Court.  In addition, issues related to the March 5th Escrow will involve application of the Bankruptcy Code, including issues under §§ 544 and 547, among other issues to the Weider and Forman Claims.  Weider and Forman have sought relief from the automatic stay which is pending at this time.  If the Bankruptcy Court grants such relief, the Weider and Forman Claims will proceed to determination in the District Court.  If the relief is denied, it will be determined in this Court.

The Debtors intend to file an adversary proceeding against Weider and Forman, pursuant to which Debtors will seek a determination from this Court that the funds deposited into the March 5th Escrow are property of the Debtors' Estates, and alternatively that the March 5th Escrow, in the nature of attachment of Debtors' funds, is avoidable pursuant to 11 U.S.C. § 547 and § 544.  This action will be necessary to determine rights to the $7,309,276 held in the March 5th Escrow.

**<u>Earthquake Litigation</u>**

International Energy Corporation is a named defendant in twenty (20) actions filed against dozens of operators of oil and gas properties in Oklahoma in various Oklahoma district courts as noted below. No other Debtors are involved in this litigation. These litigation matters assert claims allegedly arising from earthquakes of which International Energy Corporation was alleged to be a cause by virtue of disposal of saltwater into Oklahoma Corporation Commission approved disposal wells. International Energy Corporation vigorously denies the claims of liability in the following lawsuits alleging that the disposal of wastewater into injection wells caused earthquakes that damaged the plaintiffs' properties:

- *Caldwell, et a. v. Berexco LLC, et al.*, Case No. CJ-2018-499 in Payne County;
- *Cooper, et al. v. Berexco LLC, et al.*, Case No. CJ-2018-500 in Payne County;

- *Navrath, et al. v. Berexco, LLC, et al.*, Case No. CL-2018-1401 in Lincoln County;

- *Kelley, et al. v. Berexco LLC, et al.,* Case No. CJ-2018-56 in Adair County*;

- *Nelson, et al. v. Berexco, LLC, et al.*, Case No. CJ-2018-5140 in Oklahoma County;

- *Jones, et al. v. Berexco, LLC, et al.*, Case No. CJ-2018-5141 in Oklahoma County;

- *Oravetz, et al. v. Berexco, LLC, et al.*, Case No. CJ-2018-5142 in Oklahoma County;

- *James, et al. v. Berexco, LLC, et al.*, Case No. CJ-2018-5143 in Oklahoma County;

- *Steele, et al. v. Berexco, LLC, et al.*, Case No. CJ-2018-5144 in Oklahoma County;

- *Bonar, et al. v. Berexco, LLC, et al.*, Case No. CJ-2018-5145 in Oklahoma County*;

- *Harvey, et al. v. Berexco, LLC, et al.*, Case No. CJ-2018-5146 in Oklahoma County;

- *Butler, et al. v. Berexco, LLC, et al.*, Case No. CJ-2017-463 in Payne County, Oklahoma*;

- *Movlai, et al., v. Berexco, LLC, et al.*, Case No. CJ-2018-201 in Logan County, Oklahoma;

- *Owen, et al., v. Berexco, LLC, et al.*, Case No. CJ-2018-45 in Atoka County, Oklahoma;

- *Peters, et al., v. Berexco, LLC, et al.*, Case No. CJ-2018-05139 in Tulsa County, Oklahoma;

- *Dooley, et al., v. Berexco, LLC, et al.*, Case No. CJ-2018-05141 in Tulsa County, Oklahoma;

- *Mallett, et al., v. Berexco, LLC, et al.*, Case No. CJ-2018-203 in Logan County, Oklahoma;

- *Burt, et al., v. Berexco, LLC, et al.,* Case No. CJ-2018-1363 in Cleveland County, Oklahoma;

- *Austin, et al., v. Berexco, LLC, et al.,* Case No. CJ-2018-139 in Lincoln County, Oklahoma; and

- *Anderson, et al. v. Berexco, LLC, et al.,* Case No. CJ-2018-05142 in Tulsa County, Oklahoma.

The Debtors tendered the Butler case for indemnity and defense to its insurer, Berkley Oil & Gas ("Berkley"). On November 28, 2017, Berkley denied coverage on the primary policy and

on the umbrella coverage. The three cases listed above with an asterisk have yet to be served with process on International Energy Corporation.

These cases are in the preliminary stages with no discovery as to International Energy Corporation and no trial dates set. There are numerous oil and gas industry co-defendants. The plaintiffs' allegations contend that over 50 oil and gas companies disposed of saltwater within certain defined areas and that the cumulative effect was to cause "earthquakes," damaging the plaintiff's property. The amount of saltwater disposal by International Energy Corporation was less than 1% of the total disposal alleged.  The Plan provides a resolution of all Earthquake Claims.

2.2.    **Brief History of Events Leading to Bankruptcy.**  Debtors' commencement of these Chapter 11 reorganization proceedings was ultimately precipitated by the Weider Action alleging that AusTex Oil had breached the Subscription Agreement.  The filing of that lawsuit in 2017 immediately impaired the Debtors' ability to obtain capital to operate their business.  This ultimately resulted in the orderly liquidation, outside of bankruptcy, of Debtors' assets.  On March 5, 2019, AusTex Oil and International Energy Corporation deposited $7,309,276 into American Bank and Trust Company pursuant to the March 5th Escrow, as ordered by the District Court in the Weider Action, without a hearing on the deposit amount or other important matters, and over objection.  This action is in effect a prejudgment attachment, which if enforceable will provide a disproportionate payment of funds, providing for full payment of the Weider and Forman Claims. AusTex Oil and International Energy Corporation objected to the requirement to deposit the funds in escrow, including the failure of the Court to hear arguments on the amount, bond, and other matters.

2.3.   **March 5th Escrow.**

The validity and amount of the Weider Preferred Shareholder Claims and the Forman Preferred Shareholder Claims have not yet been determined. AusTex Oil believes the March 5th Escrow amount was based upon an improper calculation prepared by counsel for Weider and Forman (set forth previously in this Disclosure Statement) in which the Debtors were not permitted to contest the amount to be escrowed.  An appeal of the Order is pending in the United States Second Circuit Court of Appeals, but is currently stayed.

Were Weider and Forman successful in establishing their exclusive claims in the March 5th Escrow, such claims against the funds paid to them nevertheless *could not* exceed the amount of their actual Allowed Preferred Shareholder Claims. The Debtors believe that the amount of funds transferred are substantially more than the amount of Weider's and Forman's claims.

The maximum aggregate Claims of both Weider and Forman is $4,150,968. The Claim for interest and continuing accrued dividends are invalid. Pursuant to the Amended Deed discussed *infra*, as of October 22, 2014, no further interest or dividends were due to any Preferred Shareholder, and in lieu thereof AusTex Oil issued Preferred Shares as "payment in kind," to all Preferred Shareholders.  The additional "payment in kind" shares are included in the total amount of Preferred Shares for each Preferred Shareholder Claimants.  In addition, the "payment in kind" Preferred Shares were not entitled to any dividend.  As to attorneys' fees, Debtors contend that neither Weider nor Forman are entitled to attorneys' fees, because there has been no conclusion to the Weider Action in their favor, and the principal basis on which the case was predicated is an alleged default which did not occur.

2.4.    **Brief History of Events Subsequent to Bankruptcy.**

At the time of the commencement of these Cases, Debtors had no active business operations or employees.  The activities of Debtors since commencement of these Cases have been to administer Debtors' affairs to preserve value.  Assets and Claims have been reviewed, and a windup of their business affairs conducted in eight separate entities has been undertaken.  AusTex Oil has initiated a proceeding in Australia to establish its filing in this Court as its main proceeding. Throughout this process Debtors have operated in a streamlined fashion without employees, by utilizing a single independent contractor.  Mr. Adrey is the Managing Member of the Debtors and serves as their designated representative and manages the Cases.  Mr. Adrey has provided management of these Debtors consistently for some time prior to the commencement of these Cases, and continues to do so in these Cases.

## ARTICLE III.
Assets and Liabilities of the Debtor

3.1.    **Assets.**  The assets of the Debtors generally consist of proceeds from the sale of Debtors' oil and gas operations, properties, and equipment prior to filing bankruptcy.  In addition, limited assets of personal property remain to be liquidated.  The value of unliquidated assets is estimated on best available information.  There are (1) items of equipment and personal property estimated with a value of $150,000-$250,000, and (2) a commercial building in Drumright, Oklahoma, estimated to have a value of $75,000-$100,000.  Pursuant to the Plan, all of the assets of Debtors, whether now known or not, and wherever located, including, without limitation, all causes of action under any applicable law (whether under chapter 5 of the Bankruptcy Code, state law or otherwise), all rights of Debtors to their corporate names, structures, trade names, web sites, electronic databases, all books, and records, are to be conveyed to the Liquidating Agent for administration and distribution.

3.2.   **General Statement Regarding Claims.**  The distribution available to Creditors under this Plan, or any Plan, is essentially based upon funds available to pay such Claims. Administrative Claims, Secured Claims, Priority Claims, and Priority Tax Claims of Governmental Units have priority over Unsecured Claims.  Funds remaining after payment of such Allowed Claims and Class 4 Claims, General Unsecured Claims, and Class 5 Earthquake Claims will be paid and the balance of distributable cash applied *pro rata* for payment of Class 6 Allowed Preferred Shareholder Claims.

3.3.   **Leases and Executory Contracts.**  The Plan does not propose to assume any leases or executory contracts which existed on the Petition Date.  All leases and executory contracts shall be deemed rejected by the Confirmation Order.

3.4.   **Creditor Claims Asserted Against the Debtors.**

(1)   <u>Class 1: Allowed Secured Claims</u>.  This Class consists of all Allowed Secured Claims to which no objection has been or will be interposed.  To the extent that these Secured Claims are secured by different collateral or different interest in the same collateral, such Claims will be treated as a separate subclass of Class 1.  As noted in the Plan, there are no known Secured Claims against Debtors.  This Class is created in the event a Secured Claim is established, but such is not expected.

(2)   <u>Class 2: Allowed Priority Tax Claims of Governmental Units</u>.  This Class consists of all Allowed Tax Claims of Governmental Units.

(3)   <u>Class 3: Allowed Priority Claims</u>.  This Class consists of all Allowed Priority Claims.  To the extent that these Allowed Priority Claims fall within different priority status as set forth on § 507(a) of the Bankruptcy Code, such Claims will be treated as a separate subclass of Class 3.

- 26 -

(4)    <u>Class 4: Allowed General Unsecured Claims</u>. This Class consists of all Allowed General Unsecured Claims to which no objection has been or will be interposed, or, if objection is made has been determined.

(5)    <u>Class 5: Allowed Earthquake Claims</u>.  This Class consists of all Allowed Earthquake Claims to which no objection has been or will be interposed, or if objection is made has been determined.

(6)    <u>Class 6: Preferred Shareholder Claims</u>.  This Class consists of all Allowed Claims of Preferred Shares issued by the Debtors.  This Class is paid after classes of all holders of Allowed Unsecured Claims and Allowed Earthquake Claims are paid pursuant to the Plan.

(7)    <u>Class 7: Interests</u>.  This Class consists of the holders of Interests of the Debtors.  It does not include Preferred Shares.

3.5.   **<u>Elimination of Vacant Classes</u>.**

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing of this Plan, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies § 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6.   **<u>Treatment of Claims and Interests</u>.**

The Treatment of Classes for all pre-petition Claims and Interests asserted against the Debtors is for all Debtors, unless denoted differently.

(1)     Class 1: Allowed Secured Claims.  Creditors in this Class 1 will retain their security interest and liens to the same extent and priority as existed prior to the Petition Date upon assets serving as collateral for their Allowed Secured Claim until such Claim is paid in full or the collateral has been sold or transferred pursuant to this Plan.  In the alternative, the Debtor may elect to surrender the collateral to the holder of such claim at its sole election.  This Class 1 is unimpaired and presumed to vote in favor of the Plan.

(2)     Class 2: Allowed Priority Tax Claims of Governmental Units.  The Claims in this Class 2 consist of holders of Allowed Tax Priority Claims of Governmental Units.  Holders of such Allowed Priority Tax Claims of Governmental Units will receive a distribution after payment of the Allowed Secured Claims and Allowed Administrative Claims within 90 days after disbursement of the sale proceeds if funds are available for such distribution.  If such Allowed Priority Tax Claims are not paid in full from the initial distribution, holders will be entitled to additional distributions from other sources, if any, until such Claims are fully paid.

(3)     Class 3: Allowed Priority Claims.  The Claims in Class 3 consist of holders of Allowed Priority Claims.   Holders of such Allowed Priority Claims will receive distributions after payment in full of Allowed Secured Claims, and Allowed Administrative Claims as funds may be available from the sale of the Debtors' business or assets or from other sources, if any.

(4)     Class 4: Allowed Unsecured Claims.  The Claims in this Class 4 consist of holders of Allowed Unsecured Claims.  Holders of such Allowed Unsecured Claims are estimated to total approximately $264,123 with additional unsecured claim in Australia of AU$155,388 (or approximately US$108,772).  It is anticipated that holders of Allowed

Unsecured Claims will be paid in full.  This Class 4 is unimpaired and presumed to vote in favor of the Plan.

(5)     Class 5:  Allowed Earthquake Claims.  The Claims in this Class 5 consist of approximately 1,128 creditors (husbands and wives or other joint claimants are being treated as one individual claim) who assert claims for alleged damages arising from the commercial activities of the Debtors.  These individuals will receive an Allowed Claim of $300, and based upon payment of such amount, the Debtors shall be dismissed from the lawsuits asserting such claims, with prejudice to refiling.  The total aggregate payment under this Plan to holders of Allowed Earthquake Claims and their counsel is capped at $390,000.  In the event holders of such claims assert claims aggregating more than that amount, the holders will receive their *pro rata* distribution from $390,000.  The treatment for holders of Earthquake Claims is a settlement and compromise and will be withdrawn absent approval by this Class.  Absent approval, the Class will be treated as contingent, disputed, and unliquidated, and subject to allowance by the Bankruptcy Court.  Counsel for these individuals (two law firms for all parties in multiple lawsuits) will be entitled to each a single fee of $25,000 in the event the holders of such claims vote in favor of the Plan.  This Class 5 is impaired and entitled to vote on the Plan.

(6)     Class 6:  Allowed Preferred Shareholder Claims.  This Class 6 consists of all holders of Allowed Preferred Shareholder Claims against the Debtors. All such claims (including any guarantee claims held by such holders of Allowed Preferred Shareholder Claims) will be paid after the payment to holders of Allowed Unsecured Claims and Allowed Earthquake Claims. It is estimated that there will be approximately $15.5 million dollars after payment of all other claims that will be available for distribution to holders of

Claims in this Class 6. Assuming that all claims in this Class 6 were allowed in the amounts shown on the Debtors' books and records, holders of such claims would receive the following distributions:

| Preferred Shareholder | Claim Amount Per Books of AusTex Oil | Estimated Distribution |
|---|---|---|
| Ptolemy Energy Holding – Class A | $14,715,632.50 | $6,907,932.77 |
| Ptolemy Energy Holding – Class B | $13,237,201.05 | $6,213,917.56 |
| Young Capital Partners, LP – Class A | 0 | 0 |
| Young Capital Partners, LP – Class B | $915,066.45 | $429,558.14 |
| Weider Health and Fitness – Class A | $1,146,434.10 | $923,023.56 |
| Weider Health and Fitness – Class B | $1,807,346.10 | $848,419.51 |
| Bruce Forman – Class A | 0 | 0 |
| Bruce Forman – Class B | $377,370.60 | $177,148.46 |

However, Weider and Forman each assert that $7,309,276, the March 5th Escrow, is available only for payment for their Preferred Shareholder Claims. Debtors contend that such funds should be distributed *pro rata* to Allowed Preferred Shareholder Claims. The resolution of the dispute concerning the March 5th Escrow will require litigation.  This Plan provides for two distributions. The initial distribution shall be *pro rata* to the holders of Allowed Preferred Shareholder Claims utilizing an estimated $8,100,000, together with any additional funds available for distribution from sale of miscellaneous assets. The second distribution will be made consistent with the final order determining the status of the March 5th Escrow, whether property of the Estate or recoverable for the Estate permitting *pro rata* distribution, or whether the property is subject to claims of Weider and Forman. If the final decision determines in favor of Weider and Forman's Claim, after credit for amounts received in the initial distribution, then pursuant to the Plan, the March 5th Escrow proceeds will be distributed to Forman and Weider, each in accordance with their respective Allowed Preferred Shareholder Claims, and any remaining balance will be distributed *pro rata* to the other holders of Allowed Preferred Shareholder Claims to the extent of funds available. If the final determination is that the March 5th Escrow is not for the exclusive benefit of

Weider and Forman, the funds will be distributed *pro rata* to the holders of all Allowed Preferred Shareholder Claims. Debtors will present the issue of the status and effect of the March 5th Escrow to this Court by Adversary Proceeding for determination.

This Class 6 is Impaired and Entitled to Vote on the Plan.

(7)    Class 7: Interests. All Interests will remain outstanding as existed prior to the Petition Date, but will only be entitled to distributions after payment in full of all holders of all other Claims. To the extent funds are not available to pay the holders of all other Claims in full, such Interests will be terminated.

3.7.    **Administrative Claims.**

Under the Bankruptcy Code, the actual, necessary costs and expenses of preserving the estate; i.e., administrative claims, must be paid in full under a Chapter 11 plan. Costs of operating the business incurred while in Chapter 11 are ordinarily paid without the need for Court approval. Administrative claims that the Bankruptcy Code requires Debtors to pay on or before the Effective Date of the Plan include the fees and expenses incurred by the professionals as well as the quarterly fee due to the United States Trustee. Administrative claims, pursuant to the Bankruptcy Code, are required to be paid in full on or before the effective date of the Plan upon approval by the Bankruptcy Court or paid otherwise by agreement. The following professionals have been retained:

| Professional | Position | Retainer |
|---|---|---|
| McDonald & Metcalf, LLP | Debtor's Counsel | $300,000 |
| Baker McKenzie (Australia) | Australian Counsel | $40,000 |
| Hancock & Company | Accountants to Debtors | None |

Debtors estimate that its attorneys' fees incurred from filing through September 30, 2019, are approximately $200,000, and that from October 1, 2019, through Confirmation in mid-December will approximate another $150,000. The payment of these funds will be funded by

retainer of $300,000 and funds of the Debtors.  The payment of approved fees to Baker McKenzie Australia will be paid from its retainer, with any additional amounts due to Baker McKenzie Australia and fees and expenses approved for Hancock & Company to be paid by Debtors as Administrative Claims.

    3.8.   **Claim Review and Objection.**

To the extent that claims and interests have not been determined, the Liquidating Agent will conduct and complete a review of Creditor Claims within one hundred eighty (180) days of the Effective Date, concerning any Claims or Interests which have not been determined, and will file within such period all objections to such Claims.

## ARTICLE IV.
### Liquidation Agent

Richard Adrey will serve as the Liquidating Agent post-Confirmation.  Mr. Adrey has been in management of the Debtors since 2006, and was principally responsible for the sale of the Debtors' Assets, which have provided the distributable funds.  Mr. Adrey, as Liquidating Agent, will be compensated based upon the receipt of 2% of the amount of distributions to Creditors, under this Plan.  Mr. Adrey is currently compensated for his management services and as Managing Member receives $17,500 per month.  On Confirmation, these payments will cease.

## ARTICLE V.
### Summary of the Plan

**SOME PROVISIONS OF THE PLAN ARE NOT DESCRIBED IN THIS DISCLOSURE STATEMENT.  EACH CREDITOR SHOULD REFER TO THE PLAN ITSELF FOR A FULL ANALYSIS OF ITS CONTENTS.  IN THE EVENT OF ANY DIFFERENCE BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN WILL CONTROL.**

The Plan provides for but is not dependent upon the following:

1.      In small part, upon sale of Debtor's limited remaining assets of estimated aggregate value of $225,000 to $350,000.

2.      Collection of recovery actions, including recovery of claims.

3.      Claim reduction through objection.

4.      The amount of distributable funds available for Preferred Shareholders, is dependent upon Debtors' success in discharging or avoiding the March 5th Escrow, so that $7,306,276 will be available for *pro rata* distribution to Allowed Preferred Shareholder Claims, rather than to Weider and Forman to the extent of their Allowed Claim.

### 5.1.  **General Overview.**

The Plan is a liquidating plan.  It proposes to pay Creditors from funds on hand of approximately $16,500,000, subject to the March 5th Escrow, and funds generated from further liquidation of Debtors' assets (estimated $225,000-$350,000) after payment of amounts due to holders of valid liens (if any) against the assets as provided in the Plan.  There are no liens known against the remaining unliquidated property.  The Liquidating Agent will administer the Plan and make payments according to the terms contained in the Plan.

### 5.2.  **Classification of Claims and Treatment.**

The Plan classifies claims in the following classes:

| Class | Description |
|-------|-------------|
| 1 | Secured Creditors.  None are known. |
| 2 | Allowed Priority Tax Claims of Governmental Units.  Class 2 Priority Tax Claims of Governmental Units entitled to priority pursuant to § 507(a)(8) of the Bankruptcy Code. It is anticipated that Allowed Priority Tax Claims of Governmental Units will receive a distribution after payment of the Allowed Secured Claims and Allowed Administrative Claims within 90 days after disbursement of the sale proceeds if funds are available to such distributions. If such Allowed Priority Tax Claims of Governmental Units are not paid in full from the initial distribution, |

holders will be entitled to additional distributions from other sources, if any, until such Claims are fully paid. These Allowed Priority Tax Claims of Governmental Units will be paid in full.

3       <u>Allowed Priority Claims</u>. This Class includes all Priority Claims, other than Priority Tax Claims. Class 3 Priority Claims will be paid after payment in full of all Allowed Secured Claims and Allowed Administrative Claims as funds may be available from the sale of Debtors' business, or assets, or from other sources, if any. The amount of any Claimants' Allowed Priority Claim exceeding any cap provided in § 507 of the Bankruptcy Code shall be an Allowed Class 4 Claim. The Court will retain jurisdiction to resolve any issue related to priority or extent of priority of any Claimant. These Allowed Priority Claims will be paid in full.

4       <u>Allowed Unsecured Claims</u>. Class 4 Claims consist of all Unsecured Claims. These Allowed Claims will be paid in full.

5       <u>Allowed Earthquake Claims</u>. Class 5 consists of the claims of Earthquake Litigants, believed to be approximately 1,128 claims (consisting of claims by a husband and wife as one claim). These Claims will be paid, upon acceptance of the Plan by this Class, $300 to each Claimant (husband and wife considered one claim) and $25,000 each paid to counsel for such Claimants. These law firms are Atkins and Markoff of Oklahoma City, Oklahoma, and Laminack, Pirtle & Martines, LLP, of Houston, Texas. Recovery by this Class 5, including payment to counsel, will be capped at $390,000.

6       <u>Allowed Preferred Shareholder Claims</u>. This Class consists of the holders of Preferred Shares. After payment of administrative claims and Classes 1, 2, 3, 4, and 5, the balance of distributable funds (estimated at $15,500,000, subject to the March 5th Escrow) will be distributed to holders of Allowed Preferred Share Claims on a *pro rata* and *pari pasu* basis. In the event the Debtors are unsuccessful in discharging or voiding the March 5th Escrow, this fund would be reduced by as much as $7,309,276. In addition, all net sums from Recovery Actions will be made available for distribution to holders of Allowed Preferred Shareholders, except that no holder of Allowed Preferred Shareholder Claims from whom a recovery has been obtained, shall receive a share of such Recovery Action Proceeds.

7       <u>Interests</u>. All interests will remain outstanding as existed prior to the Petition Date, but will only be entitled to distributions after payment in full of all Claims of Creditors in Classes 1 through 6. Any such distribution will be made on a *pro rata* basis, based upon Interests held as a portion of total Interest outstanding. It is not anticipated that a distribution will be made to Class 7.

## ARTICLE VI.
Administration after Confirmation of the Plan

Assets of Debtors, including cash, as provided in the Plan, will be transferred to the Liquidating Agent.  The Liquidating Agent will proceed with efforts to sell the miscellaneous assets on hand and collect amounts due, and will pursue claims against third parties on behalf of the Estate pursuant to the Plan, based upon the declining balance.

6.1.    **Disputed/Undetermined Claims.**

Debtors and Liquidating Agent will not make any payments on any Disputed Claims, but will reserve from any distribution funds necessary to fund such distribution as if such claims in amounts asserted were allowed, pending claim resolution.  Upon the Confirmation Date, if a proof of claim has not been filed, any Claims scheduled as disputed for which a Creditor did not file a proof of claim and all Claims listed on Schedules as unknown or as zero will be disallowed. However, if a Creditor originally scheduled by the Debtor as disputed filed a proof of claim, the Claim will continue to be treated as a Disputed Claim, until any objection is determined.

## ARTICLE VII.
Effective Date of the Plan

The Effective Date of the Plan; i.e., when it goes into effect, will occur when the Confirmation Order is a Final Order, provided no stay of the Confirmation Order has been issued, unless such date falls on a weekend or holiday in which case the Effective Date shall be the next business day.

## ARTICLE VIII.
Release and Exculpation

**THE PLAN PROVIDES THAT ALL DEBTORS, THEIR OFFICERS AND DIRECTORS, AND THEIR COUNSEL AND PROFESSIONALS, SHALL BE RELEASED AND EXCULPATED FROM ANY CLAIM OR LIABILITY TO ANY HOLDER OF A**

**CLAIM OR INTEREST HOLDER FOR ANY ACT OR OMISSION IN CONNECTION WITH, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THIS PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.**

### ARTICLE IX.
Alternative to the Plan

The only alternative to the Plan known by the Proponents is the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code, in which a trustee would be appointed to liquidate Debtors' assets and administer the estate.  Essentially, this Plan is a liquidation, subject to the provisions of the Bankruptcy Code.  The "best interests" test under section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim or interest of each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.   The Proponents believe that the Plan provides a superior alternative to Chapter 7.

Because the Plan provides for the distribution of the Debtors' assets, the "best interests" of creditors test requires a comparison of the expenses of a Chapter 7 liquidation with the expenses of distribution and administration under the Plan.  The Proponents examined the potential recoveries to Creditors if these Cases were converted to cases under Chapter 7 of the Bankruptcy Code and have concluded that distributions to Creditors under the Plan will – at the worst – equal any distribution to Creditors if these Cases were converted to Chapter 7 of the Bankruptcy Code.

The most significant assets of Debtors have been liquidated.  However, limited additional assets remain to be sold or collected from third parties.  Additionally, there are several potential claims Debtors can assert against third parties for additional recoveries.  The Plan provides for the sale of the remaining assets and pursuit of such third party claims.

If a Chapter 7 liquidation were pursued, the amount of liquidation value available to unsecured creditors would be reduced, first, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 Cases.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred in the Chapter 11 Cases that are allowed in the Chapter 7 case, litigation costs and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.  The Proponents believe that the members of each Class of Impaired Claims will receive more and receive it more promptly under the Plan than they would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

Any appointed Chapter 7 trustee would have to become familiar with these Cases and hire new attorneys and other professionals to assist in administering the Estates and liquidating Debtors' remaining assets.  Proponents believe that a Chapter 7 Trustee would be compelled to challenge the Claims of Weider and Forman under the March 5th Escrow.  In addition, the United States Bankruptcy Code provides a Trustee fee of 3% on amounts disbursed over $1 million.  The Chapter 7 trustee fees, assuming a distribution of $16,500,000, is estimated to be in excess of $450,000 under the provision of the Bankruptcy Code.  This would cost the Estate additional funds based on disbursements by a Chapter 7 Trustee.  On the other hand, the Liquidating Agent has

agreed on a 2% fee on distributed funds, resulting in a significant savings versus the costs of a Chapter 7 trustee.

In addition, conversion to a Chapter 7 liquidation likely would delay any ultimate distributions to holders of Allowed Claims.  If the Chapter 11 Cases were converted, the Chapter 7 trustee would be required to hold a new first meeting of creditors pursuant to section 341 of the Bankruptcy Code.  Given the time periods required to notice such a meeting and assuming a hypothetical conversion date of December 15, 2019, the meeting would probably not be held until at least February 2020.  After that meeting, creditors would be given a second opportunity to file claims.  Under the Bankruptcy Rules, creditors would have ninety (90) days from the date of the creditors' meeting to file claims.  After the new claims bar date passed, the trustee would be required to review all of the claims.  As a result of the conversion to Chapter 7, the Proponents believe that it is likely that some creditors could file duplicate claims or change the amounts of their claims.  This would require the Chapter 7 trustee to undertake a more complicated and time consuming claims reconciliation process before any distributions could be made to creditors.  The Chapter 7 trustee would then have to file a final report, and the Office of the United States Trustee would have to review the report.  The process of filing and reviewing the final report can take anywhere from two to six months.  Then the Court would have to schedule a hearing on the final report with notice to all creditors.  Only after the Court approved the final report would a distribution be made to creditors.

Because conversion to Chapter 7 would delay a distribution and likely result in a smaller distribution to holders of Claims, the Proponents submit that the Plan is in the best interests of creditors and meets the requirements of section 1129(a)(7) of the Bankruptcy Code.

## ARTICLE X.
Confirmation of the Plan

The Plan must be accepted by a sufficient number of Creditors to be confirmed.  Whether this requirement is met is determined by counting the votes cast in each Class.  The Bankruptcy Code requires that the Plan be accepted by at least one Class that is impaired by the Plan.  Under the Bankruptcy Code, a Class has accepted the Plan if, counting all holders of claims that vote in a Class, the holders of (i) at least 2/3 of the aggregate dollar amount and (ii) more than 1/2 in number of the Allowed Claims vote to accept the Plan.

If at least one Class accepts the Plan, the Proponents may ask the Bankruptcy Court to confirm the Plan even if other Classes have voted against it.  The Bankruptcy Code sets a minimum standard that the Plan must meet in order to confirm the Plan despite its rejection by one or more Classes.  If an unsecured Class impaired by the Plan rejects it, no claim or interest that is junior to the most senior unsecured rejecting Class may retain or receive property under that Plan on account of its junior Claim or interest in any property unless the senior Class will be paid in full.

Section 1129 of the Bankruptcy Code contains other criteria that the Bankruptcy Court must find have been met before it may confirm a plan of reorganization.  One criterion, which is applicable unless every holder of a claim in a particular impaired class has voted to accept the Plan, is that the amount to be received under the Plan by each holder of a claim in that Class is not less than the amount such holder would receive in a hypothetical liquidation of the Debtor's assets.

To calculate what members of each impaired Class would receive in this hypothetical liquidation, it must first be determined the dollar amount that would be generated from the liquidation or is available for distribution.  From the gross amount of funds available the cost of the liquidation (including fees of professionals), the unpaid expenses of the reorganization proceeding, and other obligations that would have priority under bankruptcy law are subtracted.

These costs, and any other expenses that would be incurred in the hypothetical liquidation and which were actually incurred in the current reorganization proceedings, would be paid in full before any proceeds of liquidation would be available to pay Unsecured Creditors.  Also, the proceeds of sale of any property that was collateral for any Secured Claim would be paid first to the Secured Creditor who held the security interest.  Any funds remaining after the subtraction of these costs, expenses, and claims would be paid, pro rata, to the holders of Allowed Unsecured Claims in this hypothetical liquidation case.  If the Plan provides for an equal or greater payment to these Creditors than the hypothetical liquidation, it meets this criterion of the Bankruptcy Code. Proponents believe that each Creditor will receive an amount under the Plan that is greater than the amount such Creditor would receive if Debtors were liquidated under a Chapter 7.

Section 1129 of the Bankruptcy Code provides that the Bankruptcy Court shall not confirm a plan of reorganization unless the plan is feasible (that is, its confirmation is not likely to be followed by liquidation or the need for further financial reorganization).  The Proponents have concluded that the Plan satisfies this criterion, inasmuch as no Debtors will reorganize, as this is a liquidation Plan.

<b><u>ARTICLE XI.</u></b><br>Miscellaneous Matters

11.1.   **Risk Factors.**

        A.   **Liquidating Remaining Assets.**

Debtors have already liquidated the vast majority of their tangible assets and hold approximately $16,500,000 in cash, including the March 5th Escrow.  The remaining assets include only miscellaneous assets, valued at $225,000-$350,000.  In addition, the assets include potential claims against third parties which may be subject to the cost and risk attendant to litigation of

claims.  In the event the Earthquake Claims are not resolved pursuant to this Plan, a litigated resolution will require additional time and costs.

### B.     Federal and State Income Taxes.

A detailed tax accounting has not been prepared at this time.  It is anticipated that tax returns will be prepared and filed by Debtors through the date of its existence and any tax owing will be paid before a distribution to Creditors.  Creditors and Interest holders should seek counsel on the separate tax treatment of their interests and any distributions received.

### C.     Tax Consequences.

The federal income taxation of reorganizations under the Internal Revenue Code is complex and, on many issues, not well settled.  Neither a ruling from the Internal Revenue Service nor an opinion of counsel has been requested or will be obtained with respect to the federal income tax consequences of the Plan.

**THE PROPONENTS ASSUME NO RESPONSIBILITY FOR, AND MAKE NO REPRESENTATIONS REGARDING THE EFFECT THE CONSUMMATION OF THE PLAN WILL HAVE ON THE TAX CONSEQUENCES TO ANY CREDITOR OR INTEREST HOLDER.  THEREFORE, CREDITORS AND HOLDERS OF INTERESTS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN, TAKING INTO ACCOUNT THEIR PARTICULAR TAX SITUATIONS.**

### ARTICLE XII.
Bankruptcy Procedures Governing
Solicitation of Votes, Voting, and Confirmation

### 12.1.   Explanation of Chapter 11.

Chapter 11 is the main reorganization section of the United States Bankruptcy Code.  In Chapter 11, a debtor is authorized to reorganize, or liquidate, its business for its own benefit and

that of its creditors and owners, by submitting a written plan for consideration, accompanied by information concerning the debtor and proposed plan in a disclosure statement approved by the Bankruptcy Court.

Formulation of a "Plan" is the principal purpose of a Chapter 11 case.  A plan is the document that proposes the methods for satisfying creditors' claims against the debtor.  The plan places creditors' claims into "classes" (groups of similar claims), and treats each creditor's claim within a class in the same way.  Creditors are entitled to be heard by the Bankruptcy Court about the plan, through the process of voting on, and objecting to, the plan.

Your participation in this process is important.  The Bankruptcy Court has set the following dates regarding the Plan:

| | |
|---|---|
| **Ballots Due:** | _____, 2019 |
| **Objection to Confirmation Due:** | _____, 2019 |
| **Hearing on Confirmation of Plan:** | _____, 2019 at \_\_\_\_\_ \_\_.m. |

These dates and events are explained further below:

12.2.   **The Process of Voting on the Plan.**

A Creditor's or Interest holder's right to vote depends on whether the Creditor's or Interest holder's rights against the Debtors are "impaired," as that word is defined in the Bankruptcy Code. A claim that will not be repaid in full under the Plan, or as to which the Creditor's legal rights are altered is "impaired."  A holder of a claim or interest that is impaired by a plan is entitled to vote to accept or reject that plan so long as its claim or interest has been allowed, or is deemed allowed under § 502 of the Bankruptcy Code at the time of voting.  Even a claim or interest that has not been allowed at that time can be temporarily allowed for voting purposes if the procedures given under Bankruptcy Rule 3018 are followed.

Classes 5, 6, and 7 are Impaired by the Plan. Classes 5 and 6 are entitled to vote. Class 7 is presumed to vote against the Plan. Classes 1, 2, 3 and 4 are unimpaired and are presumed to vote in favor of the Plan.

This Disclosure Statement has been approved by the Bankruptcy Court, and is being submitted to Creditors and Interest holders, together with the Plan and a Ballot for voting on the Plan to those entitled to vote.  In this case, the Bankruptcy Court has ordered that Creditors who wish to vote to accept or reject the Plan must send their Ballots to the counsel for Debtors so that they are received no later than 5:00 p.m. Central Time, on _____.  Ballots must be delivered to the following address:

Mary E. Kindelt
McDonald & Metcalf, LLP
15 East 5th Street, Suite 1400
Tulsa, OK  74103
(918) 430-3700

Creditors that hold Claims in more than one Class are entitled to submit a separate Ballot for each Class.  Completed Ballots may be returned by e-mail provided that the Ballot is a scanned image and is complete, showing the signature of the person casting the Ballot for the Creditor, and submitted to Mary E. Kindelt at mkindelt@mmmsk.com.

Once a Creditor has submitted a Ballot, the vote generally cannot be withdrawn or modified, except that Bankruptcy Rule 3018 provides that, for cause shown and within the time fixed for acceptance or rejection of the Plan, the Bankruptcy Court, after notice and hearing, may permit a Creditor to change or withdraw an acceptance or rejection.  Therefore, please take care to fully consider your intentions prior to submitting your Ballot.

**ALL PARTIES ELIGIBLE TO VOTE ON THE PLAN ARE URGED TO COMPLETE AND RETURN THEIR BALLOTS PROMPTLY TO AVOID DELAY IN**

CONFIRMING THE PLAN.  CREDITORS IN CERTAIN CLASSES ARE ALLOWED TO VOTE ON THIS PLAN, BUT THE OPPORTUNITY TO VOTE DOES NOT CONSTITUTE ALLOWANCE OF ANY CLAIM OR INTEREST.  IF YOU HAVE ANY QUESTIONS REGARDING PROCEDURES FOR VOTING, CONTACT THE ATTORNEY FOR DEBTORS AT THE ADDRESS STATED ON THE LAST PAGE OF THIS DISCLOSURE STATEMENT.

     12.3.   **Hearing on Confirmation of the Plan.**

After the Ballots are received and counted, the Bankruptcy Court will hold a confirmation hearing on the Plan.  Confirmation is the process by which the Bankruptcy Court will decide whether a sufficient number of Creditors have voted for the Plan, and whether the Plan meets the other requirements of the Bankruptcy Code.  If the Bankruptcy Court confirms the Plan, it will become binding on all parties, whether or not they have voted for the Plan.

**THE BANKRUPTCY COURT HAS SCHEDULED A HEARING ON CONFIRMATION OF THE PLAN TO COMMENCE AT on _____.m. Any party who wishes to object to confirmation of the Plan must file a written objection with the Bankruptcy Court and must also send a copy of such objection to Chad J. Kutmas, of the firm, McDonald & Metcalf, LLP, 15 East 5th Street, Suite 1400, Tulsa, Oklahoma 74103, or by e-mail at ckutmas@mmmsk.com, and any other person entitled to receive service of the objection no later than _____.**

     12.4.   **Sources of Information, Responsible Parties, and Disclaimers.**

This Disclosure Statement has been approved by order of the Bankruptcy Court dated _____, as containing, in accordance with requirements of the Bankruptcy Code, adequate information of the kind and in sufficient detail that would enable a reasonable,

hypothetical investor typical of holders of impaired classes of claims or interests to make an informed judgment about the Plan.

Except as otherwise noted, the sources of information contained in this Disclosure Statement are the pleadings filed during bankruptcy, information from the Debtors' representatives and files, and records available to Debtors.

ALTHOUGH THE PROPONENTS OF THE PLAN HAVE MADE EVERY EFFORT TO PROVIDE ACCURATE AND COMPLETE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PROPONENTS MAKE NO REPRESENTATION THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS OR INTERESTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT WAS COMPILED.

NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED BY ITS PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   THE INFORMATION CONTAINED HEREIN CONCERNING THE PLAN HAS NOT BEEN THE SUBJECT OF A CERTIFIED AUDIT.   ALL THE FINANCIAL INFORMATION WITH RESPECT TO THE DEBTOR WAS COMPILED FROM THE DEBTOR'S RECORDS AND THE PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

CERTAIN OF THE INFORMATION AND ESTIMATES, BY THEIR NATURE, ARE FORWARD LOOKING, AND ESTIMATES AND ASSUMPTIONS MAY PROVE TO BE INACCURATE, SO THAT PROJECTIONS MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE EXPERIENCE.

### ARTICLE XIII.
Conclusion

Debtors believe that the Plan represents a fair and feasible proposal for the liquidation of the business and ultimate disposition of Debtors that will provide Creditors with a greater return than any other alternative.  Accordingly, Debtors encourage Creditors to vote to accept the Plan.

Dated this 1st day of October, 2019.

McDONALD & METCALF, L.L.P.

*/s/ Gary M. McDonald*

By:  _____
Gary M. McDonald, OBA No. 5960
Chad J. Kutmas, OBA No. 19505
Mary E. Kindelt, OBA No. 21728
15 East 5th Street, Suite 1400
Tulsa, OK 74103
(918) 430-3700
(918) 430-3770 - Facsimile
*Attorneys for Debtors*

- 46 -

**SCHEDULE 1**

## VEHICLES

| | | | |
|---|---|---|---|
| 1976 | CHEVROLET | WINCH | CJH936V127151 |
| 1982 | INTERNATIONAL | PULLING UNIT | 1HTL23279CGA12328 |
| 1984 | AMERICAN GEN | ARMY TRUCK | NL0ADLC53600142 |
| 1988 | CHEVROLET | TT | 1GBJ7D1GXJV100277 |
| 1995 | FORD | BUCKET TRUCK | 1FDLF47FXSEA38818 |
| 1995 | FORD | F250 | 1FTHX26G1SKA40805 |
| 1997 | KENWORTH | TT | 1NKDL2X7VR756530 |
| 1998 | INTERNATIONAL | SEMI | 2HSFPAHN1WC055724 |
| 2000 | FREIGHTLINER | FLD | 1FUYDSE84YPF38860 |
| 2000 | FREIGHTLINER | FLD | 1FUYDSEBXYPF38863 |
| 2000 | INTERNATIONAL | COIL TUBING | 1HTSCABM7YH235047 |
| 2006 | FORD | F150 | 1FTPW12546K74727 |
| 2006 | FORD | F350 | 1FDWF37P76EB33763 |
| 2007 | DODGE | 3500 | 3D6WH48A67G843272 |
| 2007 | DODGE | 1500 | 1D7HA18267S238550 |
| 2008 | DODGE | 1500 | 1D7HA16N98J208012 |
| 2009 | PETERBUILT | COIL TUBING 2 | 2NPRLN0X49M769506 |
| 2010 | FORD | F150 | 1FTFX1EV6AFC65648 |
| 2013 | FORD | EXPLORER | 1FM5K8F82DGB22153 |

## TRAILERS

| | | | |
|---|---|---|---|
| 1975 | FRUE LOWBOY | DROP DECK | FWS668907 |
| | SHOP BUILT | PUMP TRAILER / PUMP | NONE |
| | FLARE TRAILER | | NONE |
| | PUMP TRAILER | HIGH PRESSURE | NONE |
| 2011 | FORD | UTILITY | 1F9BU209BS328102 |
| 1978 | BELCHE | 3 AXLE | 7090BEL |
| 1980 | TRIANGLE | GOOSENECK | 40480TR1ANGLK |
| 2007 | PJ | GOOSENECK | 4P5FD302371095875 |
| 2002 | HILBILT | DUMP | 1H9A3B4A321015012 |
| 2008 | DIAMOND | GOOSENECK | 5FWFP222X8R012107 |
| 2006 | STARLITE | TEST UNIT 1 | 13YFS18246C098004 |
| 2012 | STARLITE | REDA | 13YFS1826CC116515 |
| 2017 | ELITE | GOOSENECK | 1E9BF3020HS230115 |

## EQUIPMENT

| | | | |
|---|---|---|---|
| | BOWEN | 85 TON POWER SWIVEL | 3D0140099 |
| | ECHO METER | FLUID LEVEL GUN | |
| | CASE | BACLJPE | |
| | | | |
| | | | |
| | | | |

# COMPUTER & EQUIPMENT

| | | |
|---|---|---|
| Lenovo Think Pad w/docking station | Type 4338 | M3-AK62 B |
| Dell Laptop | | 36893972054 |
| Dell Docking Station | | QAD211000617 |
| Dell Desktop Tower w/ Software | THX Series | 212L8P1 |
| HP  Desktop Tower w/Software | HP Pavilion | 101909023 |
| Dell PowerEdge Server | T430 | 08R2 Std 1-4pcu 5ct |
| Tripp-Tite Server Battery Backup | | 2451CVLSM871900827 |
| Monroe Calculator | | UX070175 |
| EPSON High Speed Scanner | DS-6500 | PWTZ006163 |
| HP DesignJet Printer-Plotter | T790 | CN1421H003 |
| Brother MFC-9130CW Printer | | U63479F3J162438 |
| Brother MFC-9130CW Printer | | U63479F3J160937 |
| Brother MFC-9325CW Printer | | U63095C2J810721 |
| Brother MFC-J6910 DW Printer | | U62727C1F358229 |
| Dell Monitor | | CN-0RN071-46633-78V-OR55 |
| Dell Monitor | | CN-0RN071-46633-78V-OR68 |
| Dell Monitor | | CN-0V6WMN-72872-11H-19DL |
| Dell Monitor | | CN-0TW956-64180-7BC-1NUU |
| Dell Monitor | | CN-OTW956-64180-7AR-42SL |
| Dell Monitor | | CN-0DGPV4-61480-4CT-OH3T |
| Dell Monitor | | CN-0R9F1P-74261-ACC-3A4L |
| Dell Monitor | | CN-0GM304-64180-36TOE9L |
| AOC Monitor | | AAEE59A009778 |
| AOC Monitor | | AAEE50A025501 |
| KDS Monitor | | F0SU7C073377U |
| KDS Monitor | | F0SU7C073376U |
| Dell Sonic Wall SOHO | | 18B169566B68 |
| Desk Mountable (3) Monitor Holder | | |
| Desk Mountable (3) Monitor Holder | | |

Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **In Re:** | ) | **Chapter 11** |
| | ) | |
| **AUSTEX OIL, LTD., et al.,[1]** | ) | **Case No. 19-11138-M** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |

### JOINT PLAN OF LIQUIDATION OF THE DEBTORS

### ARTICLE I.
### Introduction

This Joint Plan of Liquidation ("Plan") is proposed by the Debtors in these jointly-administered Chapter 11 Cases. Capitalized terms, not reflecting grammatical rules of capitalization, if not identified by quotation marks, are defined in Article III. Accompanying this Plan is a Disclosure Statement, as may be amended, which has been approved by the Bankruptcy Court. The Disclosure Statement provides additional information to be considered in connection with this Plan.

### ARTICLE II.
### Concept of this Plan

The Debtors filed separate voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on June 3, 2019. Upon filing, the Debtors began operating as Debtors-in-Possession with all rights, powers, and duties of a trustee in bankruptcy pursuant to §§ 1107 and 1108 of the Bankruptcy Code, and their Cases were ordered jointly administered by the Bankruptcy Court.

---

[1] The Debtors in these jointly-administered Chapter 11 cases are: (1) AusTex Oil, Ltd, Case No. 19-11138-M, (2) AusTex Holdco, LLC, Case No. 19-11139-M, (3) International Energy Holding Company, LLC, Case No. 19-11140-M, (4) International Energy, LLC, Case No. 19-11141-M, (5) International Energy Company, LLC, Case No. 19-11142-M, (6) International Energy Corporation, Case No. 19-11143-M, (7) International Properties Partners, LLC, Case No. 19-11144-M, and (8) International Oil & Gas, LLC, Case No. 19-11145-M.

This Plan substantially consolidates all Debtors' estates such that all assets of all Debtors are available for funding the Plan and all creditor claims, subject to resolution of the March 5th Escrow, and interest are administered in this Plan.

AusTex Oil was founded in 2007, and was a publicly traded oil and gas company listed on the Australian Securities Exchange under the symbol "AOK." All public trading has been suspended for AusTex Oil. AusTex Oil operated in the United States through its wholly owned subsidiaries, some held directly and some indirectly, generally referred to collectively as the Oklahoma Debtors. Each of the Oklahoma Debtors is organized under laws of Oklahoma and headquartered in Tulsa, Oklahoma. The following chart depicts AusTex Oil and the Oklahoma Debtors and their relationships to each other:



The Oklahoma Debtors have monetized substantially all their respective assets to Cash. The only remaining non-cash assets to be liquidated are several items of machinery and equipment of International Energy Corporation with an estimated value of $150,000 to $250,000 and real

estate owned by International Properties Partners, LLC, in Drumright, Oklahoma, with an estimated value of $75,000 to $100,000. The Debtors hold Cash proceeds which will be utilized to fund payment of respective administrative claims and creditor claims. None of the Debtors have any operations or employees.

Under the Plan, the Debtors propose to pay creditors from Cash on hand totaling approximately $16.5 million, and liquidation of the Debtors' remaining assets, subject to resolution of restrictions upon $7,309,276 deposited in the March 5th Escrow. It is anticipated that all Allowed Administrative Claims will be paid in full. There are no known Secured Claims or Priority Unsecured Claims, but to the extent such claims are allowed they will be provided for as required by the Bankruptcy Code and will be paid in full. It is also anticipated that holders of Allowed Unsecured Claims will be paid in full.

Holders of Earthquake Claims asserting damages arising from earthquakes alleged to have been caused by business activities of the Debtors are provided with Allowed Claims in the amount of $300 each (with husband and wife being treated as a single claimant) with their respective attorneys (consisting of two law firms) being entitled to a single payment of $25,000 each, assuming the holders of Earthquake Claims vote in sufficient numbers to approve the Plan. If holders of such claims vote to accept the Plan, it is expected that all such claimants will be paid the allowed amount of $300 each. Treatment of Earthquake Claims under the Plan is a proposed settlement and compromise pursuant to Federal Rule of Bankruptcy Procedure 9019, and will be withdrawn if not approved.

The remainder of the Cash, estimated to be $15,500,000, will be distributed to holders of Allowed Preferred Shareholder Claims, subject to resolution of issues relating to the March 5th Escrow. Assuming the amounts of such claims are allowed as set forth on the books and records

of the Debtors, holders of Allowed Preferred Shareholder Claims would receive an approximate 47% pro rata distribution on account of such claims assuming that approximately $15.5 million is available after payment of all senior Allowed Claims.  This Plan will make distributions to Allowed Preferred Shareholder Claims in two installments.   The first distribution is estimated to be approximately $8,100,000 and will be distributed to Allowed Preferred Shareholder Claims.  The second distribution of $7,309,276, currently in the March 5th Escrow, will be distributed in accordance with a ruling on Weider and Forman's claim or pursuant to an agreement of the Preferred Shareholders.  Holders of Allowed Preferred Shareholder Claims may be statutorily subordinated to holders of Allowed Unsecured Claims. Holders of Interests of the Debtors will not receive anything under the Plan.

### ARTICLE III.
### Definitions

All definitions of the Bankruptcy Code are incorporated herein by reference. Also, unless the context or usage in this Plan indicates otherwise, the following words and phrases shall have these meanings when their first letter or letters are capitalized in this Plan and the Disclosure Statement, which is filed contemporaneously herewith:

3.1.    <u>Acceptance</u>. A Class of Claims or Interests has accepted this Plan if this Plan has been accepted by Creditors or Interest holders of that Class that hold at least two-thirds in dollar amount and a majority in number of the Allowed Claims or Allowed Interests vote either to accept or reject this Plan.

3.2.    <u>Administrative Claim</u>. A Claim or expense allowed by the Bankruptcy Court under § 503(b) of the Bankruptcy Code and entitled to priority pursuant to § 507(a)(1) of the Bankruptcy Code, including: (i) actual costs or expenses incurred after the Petition Date for preservation of the Estates, operating expenses incurred, including wages, salaries, or commissions for services

rendered after commencement of these Chapter 11 Cases; (ii) professional fees, pursuant to §§ 327 and 330 of the Bankruptcy Code; (iii) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930,

3.3.    Allowed Administrative Claim. An Administrative Claim that is allowed pursuant to a Final Order of the Bankruptcy Court.

3.4.    Allowed Claim. If a Claim has been timely filed before the Claims Bar Date, the allowed amount will be the claimed amount, provided no objection to the Claim is or has been filed within 180 days of the Effective Date. If no proof of claim has been filed, an allowed claim is the amount of the Claim scheduled by the Debtors pursuant to § 521(1) of the Bankruptcy Code and Bankruptcy Rule 1007(a)(1); provided, however, such Scheduled Claim is not listed upon such Schedules or any amendment thereof as either disputed, contingent or unliquidated. If an objection to a Claim is filed, the amount and validity of the Claim will be the amount determined by Final Order of the Bankruptcy Court.

3.5.    Allowed Earthquake Claim. An Earthquake Claim that is Allowed Claim and not a Disputed Claim.

3.6.    Allowed Interest. An Interest that is not disputed by the Debtors or allowed pursuant to a Final Order of the Bankruptcy Court.

3.7.    Allowed Preferred Shareholder Claim. A Preferred Shareholder Claim that is an Allowed Claim and not a Disputed Claim.

3.8.    Allowed Priority Claim. Any claim entitled to priority pursuant to § 507(a) of the Bankruptcy Code that has been timely filed before the Claims Bar Date, the allowed amount will be the claimed amount, provided no objection to the Claim is or has been filed within 180 days of the Effective Date. If no Proof of Claim has been filed, an Allowed Priority Claim is the amount

of the Claim scheduled by the Debtors pursuant to § 521(1) of the Bankruptcy Code and Bankruptcy Rule 1007(a)(1); provided, however, such Scheduled Claim is not listed upon such Schedules or any amendment thereof as either disputed, contingent or unliquidated. If an objection to a Claim is filed, the amount and validity of the Claim will be the amount determined by Final Order of the Bankruptcy Court.

3.9.   <u>Allowed Priority Tax Claim of Governmental Units</u>. Shall mean a Priority Tax Claim of Governmental Units that is an Allowed Claim and not a Disputed Claim.

3.10.   <u>Allowed Secured Claim</u>. An Allowed Claim arising on or before the Petition Date that is secured by a valid Lien on property of the Debtors that is not void or voidable under any state or federal law or an Allowed Claim for which the holder asserts a setoff under § 553 of the Bankruptcy Code, to the extent of the value (which is either agreed to by the Debtors pursuant to this Plan, or in the absence of an agreement, has been determined in accordance with §§ 506(a) or 1111(b) of the Bankruptcy Code), or an Allowed Claim that the Debtors have agreed to treat as an Allowed Secured Claim pursuant to this Plan. That portion of such an Allowed Claim exceeding the value of security held therefore shall be an Allowed Unsecured Claim to the extent a holder of a Secured Claim has preserved such Allowed Unsecured Claim, except as this Plan may provide otherwise.

3.11.   <u>Allowed Unsecured Claim</u>. An Unsecured Claim that is an Allowed Claim and not a Disputed Claim.

3.12.   <u>AusTex Oil</u>. Means AusTex Oil, Ltd.

3.13.   <u>Ballot</u>. Ballot means each of the Ballot forms distributed with the Disclosure Statement to holders of Impaired Claims and Interests entitled to vote in connection with the solicitation of acceptance of this Plan.

3.14.    <u>Bankruptcy Code</u>. The Bankruptcy Reform Act of 1978, as amended in Title 11 of the United States Code (11 U.S.C. § 101, *et seq*.).

3.15.    <u>Bankruptcy Court</u>. The United States Bankruptcy Court for the Northern District of Oklahoma, which has jurisdiction over these Cases.

3.16.    <u>Bankruptcy Rules</u>. Shall mean the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075.

3.17.    <u>Cases</u>. These jointly administered bankruptcy cases are: (1) AusTex Oil, Ltd, Case No. 19-11138-M, (2) AusTex Holdco, LLC, Case No. 19-11139-M, (3) International Energy Holding Company, LLC, Case No. 19-11140-M, (4) International Energy, LLC, Case No. 19-11141-M, (5) International Energy Company, LLC, Case No. 19-11142-M, (6) International Energy Corporation, Case No. 19-11143-M, (7) International Properties Partners, LLC, Case No. 19-11144-M, and (8) International Oil & Gas, LLC, Case No. 19-11145-M.

3.18.    <u>Cash</u>. Cash means legal tender of the United States or equivalents thereof.

3.19.    <u>Chapter 11 Cases</u>. These jointly-administered Cases.

3.20.    <u>Claim</u>. Any right to payment by a Creditor from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

3.21.    <u>Claims Bar Date</u>. The date upon which Claims must be filed as provided in Section 8.12 of this Plan. Any Claim, except an Administrative Claim, which is separately provided for in

this Plan, that has not been filed on or before such Claims Bar Date shall be deemed untimely as a Late-Filed Claim.

      3.22.  <u>Class</u>. A group or category of Claims or Interests that is substantially similar to the other Claims in such Class.

      3.23.  <u>Confirmation</u>. Means the Confirmation Date.

      3.24.  <u>Confirmation Date</u>. The date upon which the Confirmation Order is entered by the Bankruptcy Court.

      3.25.  <u>Confirmation Order</u>. The order entered by the Bankruptcy Court confirming this Plan, as it may be amended or modified.

      3.26.  <u>Consummation of this Plan</u>. Shall mean substantial consummation as defined in §1101(2) of the Bankruptcy Code. The re-vesting of assets to the Debtors upon Confirmation will constitute a transfer of all or substantially all of the property proposed by the Plan.

      3.27.  <u>Creditor</u>. Any person having a Claim against the Debtors that arose on or before the Petition Date or a Claim against the Estates of the Debtors established pursuant to a provision of the Bankruptcy Code.

      3.28.  <u>Debtors</u>. Means (1) AusTex Oil, Ltd, (2) AusTex Holdco, LLC, (3) International Energy Holding Company, LLC, (4) International Energy, LLC, (5) International Energy Company, LLC, (6) International Energy Corporation, (7) International Properties Partners, LLC, and (8) International Oil & Gas, LLC.

      3.29.  <u>Debtors' Assets</u>. Shall mean the real and personal property of the Debtors, including but not limited to the property listed in the Schedules of the Debtors.

      3.30.  <u>Debtors-in-Possession</u>. The entities created upon the filing of these Chapter 11 Cases pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.31.   <u>Disclosure Statement</u>. The written Disclosure Statement filed in this Case pursuant to § 1125 of the Bankruptcy Code, that relates to this Plan, as amended, supplemented, or modified, and approved by the Bankruptcy Court, pursuant to § 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

3.32.   <u>Disputed Claim</u>. Any Claim or portion thereof that is not an Allowed Claim, and includes without limitation, Claims (1) scheduled by the Debtors and (a) listed at zero or "unknown" or (b) for which no amount is shown, or (c) listed as "disputed," "contingent," or "unliquidated," or (2) for which a proof of claim has been filed with the Bankruptcy Court asserting a Claim and an objection to such Claim has been filed within 180 days of the Effective Date, until such objection is withdrawn or resolved by a Final Order of the Bankruptcy Court.

3.33.   <u>Earthquake Claims</u>.   Mean claims asserted in litigation brought against the Debtors by individuals contained in numerous lawsuits filed in District Courts of Oklahoma, including Adair, Atoka, Cleveland, Lincoln, Logan, Oklahoma, Payne, and Tulsa Counties.

3.34.   <u>Effective Date</u>. Shall be when the Confirmation Order is a Final Order, which is subject to a 14 day stay of execution, unless such day falls on a weekend or holiday in which case the Effective Date shall be the next business day.

3.35.   <u>Estates or Debtors' Estates</u>. The Estates of the Debtors created pursuant to § 541 of the Bankruptcy Code upon commencement of these Chapter 11 Cases.

3.36.   <u>Executory Contracts</u>. Any contract or unexpired lease to which one of the Debtors is a party and which is capable of being assumed or rejected pursuant to § 365 of the Bankruptcy Code.

3.37.   <u>Filed</u>. Filed in the Bankruptcy Court or, with regard to a proof of claim, deemed filed pursuant to § 1111(a) of the Bankruptcy Code.

3.38.   <u>Final Decree</u>. The order of the Bankruptcy Court closing these Chapter 11 Cases.

3.39.   <u>Final Fee Application</u>. The application of a Professional Person under §§ 327, 330, 503, or 1103 of the Bankruptcy Code for the final allowance of fees and reimbursement of expenses.

3.40.   <u>Final Order</u>. An order or judgment of the Bankruptcy Court, or other Court of competent jurisdiction, as entered on the docket in these Chapter 11 Cases, the operation and effect of which has not been stayed, reversed, or amended as to which order or judgment the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed, or, if filed, remains pending.

3.41.   <u>Governmental Unit</u>. Shall have the meaning ascribed to it by § 101(27) of the Bankruptcy Code.

3.42.   <u>Impaired</u>. Shall have the meaning set forth in § 1124 of the Bankruptcy Code.

3.43.   <u>Interests</u>. An Interest represented by an "equity security" as defined in § 101(16) of the Bankruptcy Code, including all common stock, partnership interests, or such other instrument purporting to represent a present ownership interest in the Debtors. Interests does not include the claims and interests held by the Preferred Shareholders.

3.44.   <u>Late-Filed Claim</u>. Any Claim, other than an Administrative Claim, that has been filed after the Claims Bar Date.

3.45.   <u>Lien.</u> Means a charge against or interest in the property, including security interests and mortgages, to secure payment of a debt or performance of an obligation.

3.46.   <u>Liquidating Agent.</u> Means the person or firm retained to act as a Liquidating Agent for the Debtors who will be responsible for holding the sale proceeds and making payments and distributions as provided by this Plan.

3.47.   <u>Litigation Claims</u>. Means the claims, rights, causes of action, defenses, counterclaims, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or the Estates may hold or assert against any non-Debtors, including without limitation, all claims, rights of action, suits, and proceedings under Chapter 5 of the Bankruptcy Code.

3.48.   <u>March 5th Escrow</u>. Means the $7,309,207 that was required to be transferred pursuant to an order of the court in the New York Litigation under a written Escrow Agreement with American Bank and Trust Company.

3.49.   <u>New York Litigation</u>. Means the action commenced in the United States District Court for the Southern District of New York under Case No. 17-CV-02089 that was commenced against certain of the Debtors by Weider Health and Fitness and Bruce Forman.

3.50.   <u>Oklahoma Debtors</u>. Means AusTex Holdco, LLC, International Energy Holding Company, LLC, International Energy, LLC, International Energy Company, LLC, International Energy Corporation, International Properties Partners, LLC, and International Oil & Gas, LLC.

3.51.   <u>Petition Date</u>. Shall mean June 3, 2019.

3.52.   <u>Plan</u>. This plan of liquidation, including all exhibits and schedules attached hereto and referenced herein, and any amendments, modifications, or supplements thereto.

3.53.   <u>Preferred Shareholders</u>. Means (1) Ptolemy Energy Holdings, LLC, (2) Young Capital Partners, LP, (3) Weider Health and Fitness, and (4) Bruce Forman.

3.54.   <u>Preferred Shareholder Claims</u>. Means claims asserted by the Preferred Shareholders that arise under the governing documents between the Preferred Shareholders and the Debtors, including but not limited, to the Subscription Agreements and Subsidiary Guarantees executed by the parties and any amendments thereto.

3.55.   <u>Priority Tax Claims of Governmental Units</u>. Any Allowed Claim entitled to priority under § 507(a)(8) of the Bankruptcy Code.

3.56.   <u>Priority Unsecured Claims</u>. Any Claims entitled to priority pursuant to §§ 507(a) of the Bankruptcy Code.

3.57.   <u>Professional Persons</u>. All legal, accounting, financial advisors, or other persons or firms retained in these Cases who have been or are to be compensated pursuant to §§ 327, 330, 503, or 1103 of the Bankruptcy Code.

3.58.   <u>Recovery Claims</u>. All claims held or vested in Debtors that may be asserted against third parties, excluding claims that have been resolved and released by settlement or litigation.

3.59.   <u>Schedules</u>. The Schedules of assets and liabilities and Statements of Financial Affairs, filed with the Bankruptcy Court by the Debtors as such Schedules and Statement of Financial Affairs may be amended or supplemented from time-to-time in accordance with Bankruptcy Rule 1009 and the Bankruptcy Code.

3.60.   <u>Scheduled Claims</u>. Shall refer to a Claim that has been listed by the Debtors on their Schedules, as amended and filed in this Case.

3.61.   <u>Secured Claim</u>. Pursuant to § 506(b) of the Bankruptcy Code, a Claim against property of the Debtors' Estates for which the claimant holds a duly perfected mortgage, lien (statutory or otherwise), security interest, or other encumbrance, as security for the payment of such Claim, to the extent that the value of the property securing the Claim is equal to or exceeds such Claim. That portion of such Claim exceeding the value of the property securing the Claim, to the extent preserved by the holder of a Secured Claim, shall be an Unsecured Claim, as defined below.

12

3.62.   <u>Subscription Agreement</u>.  Shall refer to written agreements between AusTex Oil and the Preferred Shareholders, including all exhibits and amendments thereto.

3.63.   <u>Subsidiary Guaranty</u>.  Shall refer to those certain Subsidiary Guaranty Agreements executed by the Oklahoma Debtors.

3.64.   <u>United States Trustee</u>. The Office of the United States Trustee for Region 20, and its representatives.

3.65.   <u>Unsecured Claim</u>. All Claims against the Debtors for which the claimant holds no valid lien, mortgage, security interest, or other encumbrance on property of the Estates as security for the payment thereof, and all Claims against the Estates for which the claimant holds a valid lien, mortgage, security interest, or other encumbrance on the property of the Estates as security for the repayment thereof to the extent that such claim exceeds the value of the property, to the extent the holder of a Secured Claim asserted or preserved such Unsecured Claim.

## ARTICLE IV.
### Treatment of Administrative Claims

4.1.   <u>Allowed Administrative Claims</u>. These Claims include (i) allowed Claims pursuant to §§ 503(b) and 507(a)(1) of the Bankruptcy Code and (ii) allowed Claims of professionals employed by the Debtors pursuant to §§ 327 and 330 of the Bankruptcy Code. All professional fees incurred prior to the Effective Date are subject to approval of the Bankruptcy Court pursuant to § 330 of the Bankruptcy Code.

4.2.   <u>Treatment of Allowed Administrative Claims</u>. Allowed Administrative Claims, after approval by the Bankruptcy Court, will be paid by the Debtors within 30 days of the Effective Date or within 30 days of the determination and allowance by the Bankruptcy Court, if determined after the Effective Date, or paid at a later date as may be agreed between the Debtors and the holder of an Allowed Administrative Claim. Professional fees incurred after Confirmation of this Plan

shall not require approval by the Bankruptcy Court, and will be paid by the Debtors in the ordinary course of business.

4.3.   <u>Bar Date for Administrative Claims</u>. A person or entity must file a motion to allow an Administrative Claim (other than Administrative Claims incurred pursuant to §§ 327 and 330 of the Bankruptcy Code) against the Estates within 30 days from the Confirmation Date of this Plan. A failure to file such Administrative Claim by this date shall result in such Claim being forever barred and discharged.

**ARTICLE V.**
**Classification of Claims and Interests**

This Article establishes Classes for all pre-petition Claims and Interests asserted against the Debtors. A Claim or Interest falls within a particular Class to the extent the Claim meets the description of the Class. Creditors or Interest holders may hold Claims or Interests that fall into one or more Classes to the extent that the Claim or Interest meets the description of the other Class or Classes.

5.1.   <u>Class 1: Allowed Secured Claims.</u> This Class consists of all Allowed Secured Claims to which no objection has been or will be interposed. To the extent that these Secured Claims are secured by different collateral or different interests in the same collateral, such Claims will be treated as a separate subclass of Class 1.

5.2.   <u>Class 2: Allowed Priority Tax Claims of Governmental Units</u>. This Class consists of all Allowed Priority Tax Claims of Governmental Units to which no objection has been or will be interposed.

5.3.   <u>Class 3: Allowed Priority Claims</u>. This Class consists of all Allowed Priority Claims to which no objection has been or will be interposed. To the extent that these Allowed

14

Priority Claims fall within different priority status as set forth in § 507(a) of the Bankruptcy Code, such Claims will be treated as a separate subclass of Class 3.

5.4.   <u>Class 4: Allowed Unsecured Claims</u>. This Class consists of all Allowed Unsecured Claims to which no objection has been or will be interposed.

5.5.   <u>Class 5: Allowed Earthquake Claims</u>. This Class consists of all Allowed Earthquake Claims to which no objection has been or will be interposed. Treatment of Earthquake Claims under the Plan is a proposed settlement and compromise pursuant to Federal Rule of Bankruptcy Procedure 9019, and will be withdrawn if not approved.

5.6.   <u>Class 6: Allowed Preferred Shareholder Claims</u>. This Class consists of all Allowed Preferred Shareholder Claims to which no objection has been or will be interposed. This Class is subordinate to the holders of Allowed Unsecured Claims.

5.7.   <u>Class 7: Interests</u>. This Class consists of the holders of Interests of the Debtors, but expressly excludes Preferred Shareholders.

5.8.   <u>Elimination of Vacant Classes</u>: Any Class of Claims or Interests that, as of the commencement of the hearing on Confirmation of this Plan, does not have at least one holder of a Claim or Interest that is allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies § 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## ARTICLE VI.
### Claims and Interests Impaired by this Plan

6.1.   <u>Impaired Classes</u>. Classes 5, 6, and 7 are Impaired by the Plan. Classes 5 and 6 are entitled to vote. Class 7 is presumed to vote against the Plan. Class 1, 2, 3 and 4 are unimpaired and are presumed to vote in favor of the Plan.

## ARTICLE VII.
### Treatment of Claims and Interests

This Article establishes the treatment of Classes for all pre-petition Claims and Interests asserted against the Debtors. The treatment of Classes as set forth below is for all Debtors, unless denoted differently.

7.1.    <u>Class 1: Allowed Secured Claims.</u> Creditors in this Class 1 will retain their security interests and liens to the same extent and priority as existed prior to the Petition Date upon assets serving as collateral for their Allowed Secured Claim until such Claim is paid in full or the collateral has been sold or transferred pursuant to this Plan. In the alternative, the Debtor may elect to surrender the collateral to the holder of such claim at its sole election. This Class 1 is unimpaired and presumed to vote in favor of the Plan.

7.2.    <u>Class 2: Allowed Priority Tax Claims of Governmental Units</u>. The Claims in this Class 2 consist of holders of Allowed Priority Tax Claims of Governmental Units. Holders of such Allowed Priority Tax Claims will receive a distribution after payment of the Allowed Secured Claims and Allowed Administrative Claims within 90 days after disbursement of the sale proceeds if funds are available for such distribution. If such Allowed Priority Tax Claims of Governmental Units are not paid in full from the initial distribution, holders will be entitled to additional distributions from other sources, if any, until such Claims are fully paid. This Class 2 is unimpaired and presumed to vote in favor of the Plan.

7.3.    <u>Class 3: Allowed Priority Claims</u>.  The Claims in this Class 3 consist of holders of Allowed Priority Claims. Holders of such Allowed Priority Claims will receive distributions after payment in full of Allowed Secured Claims, and Allowed Administrative Claims as funds may be available from the sale of the Debtors' business or assets or from other sources, if any. This Class 3 is unimpaired and presumed to vote in favor of the Plan.

7.4.    Class 4: Allowed Unsecured Claims. The Claims in this Class 4 consist of holders of Allowed Unsecured Claims. Holders of such Allowed Unsecured Claims are estimated to total approximately $390,00. It is anticipated that holders of Allowed Unsecured Claims will be paid in full. This Class 4 is unimpaired and presumed to vote in favor of the Plan.

7.5.    Class 5: Allowed Earthquake Claims. The Claims in this Class 5 consists of approximately 1,128 individuals (husbands and wives or joint claimants being treated as one individual) who assert claims for alleged damages to their property arising from the commercial activities of the International Energy Corporation. Each of these individuals will be allowed a $300 claim in the event that sufficient numbers of holders of Earthquake Claims vote to accept the Plan. As a condition of being provided an Allowed Earthquake Claim, the Debtors shall be dismissed from the lawsuits asserting such claims with prejudice. Counsel for these individuals (two law firms for all parties in multiple lawsuits) will be entitled to a fee of $25,000 each in the event the holders of such claims vote in favor of the Plan. This Class will be capped at $390,000. To the extent that Claimants with Allowed Earthquake Claims exceed this amount, this amount will be distributed on a *pro rata* basis. This Class 5 is Impaired and entitled to vote on the Plan. Treatment of Earthquake Claims under the Plan is a proposed settlement and compromise pursuant to Federal Rule of Bankruptcy Procedure 9019, and will be withdrawn if not accepted.

7.6.    Class 6: Allowed Preferred Shareholder Claims. This Class 6 consists of all holders of Allowed Preferred Shareholder Claims against the Debtors. All such claims (including any Subsidiary Guaranty claims held by such holders of Allowed Preferred Shareholder Claims) are subordinated to holders of Allowed Unsecured Claims and Allowed Earthquake Claims. It is estimated that there will be approximately $15.5 million dollars after payment of all other claims that will be available for distribution to holders of Claims in this Class 6, subject to determination

17

of issues relating to the March 5th Escrow. Assuming that all claims in this Class 6 were allowed in the amounts shown on the Debtors' books and records, holders of such claims would receive the following distributions pursuant to the Subscription Agreement and Subsidiary Guaranty:

| Preferred Shareholder | Claim Amount Per Books of AusTex Oil | Estimated Distribution |
|---|---|---|
| Ptolemy Energy Holding – Class A | $14,715,632.50 | $6,907,932.77 |
| Ptolemy Energy Holding – Class B | $13,237,201.05 | $6,213,917.56 |
| Young Capital Partners, LP – Class A | 0 | 0 |
| Young Capital Partners, LP – Class B | $915,066.45 | $429,558.14 |
| Weider Health and Fitness – Class A | $1,146,434.10 | $923,023.56 |
| Weider Health and Fitness – Class B | $1,807,346.10 | $848,419.51 |
| Bruce Forman – Class A | 0 | 0 |
| Bruce Forman – Class B | $377,370.60 | $177,148.46 |

Weider and Forman each assert that $7,309,276, deposited pursuant to the March 5th Escrow, is available only for payment of their Preferred Shareholder Claims. Debtors contend that such funds should be distributed *pro rata* to Allowed Preferred Shareholder Claims. The resolution of the dispute concerning the March 5th Escrow will require litigation. This Plan provides for two distributions. The initial distribution shall be *pro rata* to the holders of Allowed Preferred Shareholder Claims distributing an estimated $8,100,000, together with any additional funds available for distribution from sale of miscellaneous assets. The second distribution will be made consistent with the final order determining the status of the March 5th Escrow, whether property of the Estate for *pro rata* distribution, or property subject to claims of Weider and Forman. If the final decision determines in favor of Weider and Forman's Claim, after credit for amounts received in the initial distribution, then pursuant to the Plan, the March 5th Escrow proceeds will be distributed to Forman and Weider, each in accordance with their respective Allowed Preferred Share Claims, and any remaining balance will be distributed *pro rata* to the other holders of Allowed Preferred Shareholder Claims to the extent of funds available. If the final determination is that the March 5th Escrow is avoided or determined to be property of the Debtors' estates, and therefore is not for the

18

exclusive benefit of Weider and Forman, the March 5th Escrow funds will be distributed *pro rata* to the holders of all Allowed Preferred Shareholder Claims. Debtors will present the issue of the status and effect of the March 5th Escrow to this Court by Adversary Proceeding for determination.

This Class 6 is Impaired and Entitled to Vote on the Plan.

7.7.   <u>Class 7: Interests</u>. All Interests will remain outstanding as existed prior to the Petition Date, but will only be entitled to distributions after payment in full of all holders of all other Claims. To the extent funds are not available to pay the holders of all other Claims in full, such Interests will be terminated.

**ARTICLE VIII.**
**Means of Execution of this Plan and Provisions Governing Plan**

8.1.   <u>Vesting of the Debtors' Property; Effectuation of Plan</u>. All assets or property, rights, privileges, and claims, tangible or intangible, of whatever nature, except only for such assets as have been expressly abandoned, released, or rejected by the Debtors or specifically distributed in this Plan prior to or on the Effective Date, or as otherwise provided in this Plan, or by order of the Bankruptcy Court, shall be transferred to and shall vest in the Debtors, subject to the rights and obligations established in this Plan.

8.2.   <u>Disposition of the Debtors' Business or Assets</u>. Upon Confirmation of this Plan, the Debtors will sell their remaining assets consistent with the terms of this Plan. Such disposition may occur through multiple sales and will not require further approval by the Bankruptcy Court.

8.3.   <u>Retention of Claims</u>. This Plan will retain, transfer, and vest in the Debtors all Litigation Claims arising under contract and law, which exist in favor of the Debtors. These claims include preference claims arising under § 547 of the Bankruptcy Code, or Recovery Claims arising under §§ 544, 548, 549, 550 of the Bankruptcy Code. The Debtors shall, in their sole judgment, determine which, if any, of such retained claims the Debtors will pursue, or not pursue. There is,

and can be, no assurance of any recovery of these retained claims with respect to funding of this Plan. For the avoidance of doubt, this includes potential claims against Preferred Shareholders.

      8.4.   <u>Designation and Duties of Liquidating Agent</u>. Richard Adrey (or such other qualified professional as selected by the Debtors if Adrey cannot serve in such capacity) will be retained to act as a Liquidating Agent for the Debtors who will be responsible for holding the sale proceeds and making payments and distributions as provided by this Plan. Adrey, in his capacity as Liquidating Agent, will also be responsible for administering any remaining assets for the benefit of holders of Allowed Claims. Adrey may hire professionals, including attorneys, to assist with the duties of acting as Liquidating Agent. Adrey will be entitled to compensation of 2% of distributions to holders of Claims.[2] Payment of distributions to holders of Allowed Claims will be net of such compensation and any expenses incurred by Adrey in the course of acting as Liquidating Agent. After all the Debtors' Assets are liquidated or abandoned and distribution of all Cash has been made consistent with this Plan, neither the Debtors nor Adrey, acting as Liquidating Agent, shall have any further obligations under this Plan to holders of Allowed Claims or otherwise. To the extent it may be required, the Debtors and Adrey, solely in his capacity as Liquidating Agent, are deemed the Debtors' representative pursuant to § 1123(b)(3)(B) for purposes of retaining, enforcing, settling, compromising, releasing, or collecting any of the Litigation Claims of the Debtors, causes of action, or interests.

      8.5.   <u>Payments to Holders of Allowed Claims</u>. For purposes of calculating payments, all Disputed Claims will be treated as though they are allowed in the amounts asserted or as estimated by the Bankruptcy Court pursuant to § 502(c) of the Bankruptcy Code.

---

[2] Upon Confirmation of the Plan, the compensation paid to Adrey, other than that specified herein, by the Debtors shall cease.

8.6.    <u>Cash Payment</u>. All payments shall be made in the form of a check drawn on a domestic bank.

8.7.    <u>Delivery of Payments; Undeliverable Payments</u>. Pursuant to Bankruptcy Rule 9010, payments to holders of Allowed Claims shall be made at the address of each such holder as set forth on their proof of claim or the last known address of such holder if no proof of claim was filed. If any holder's payment is returned as undeliverable, and no such alternative address can be found after due inquiry, no further payments to such holder shall be made unless and until the Debtors are notified of such holder's current address, at which time all missed payments shall be made to such holder without interest. Undeliverable payments shall be returned to the Debtors until such payments are claimed. All requests for undeliverable payments shall be made on or before the later of (i) the 120 days after the Effective Date or (ii) within 60 days after the payment was attempted by the Debtors. After such date, all unclaimed payments shall revert to the Debtors or any successors or assigns thereto, and the Allowed Claim of any holder with respect to such payments shall be treated as forever barred and discharged. Such reverted funds will be distributed to holders of Allowed Claims as provided for in this Plan

8.8.    <u>Time Bar to Cash Payments</u>. Payments drawn on a checking account of a domestic bank shall be null and void if not negotiated within 60 days after the date of the issuance thereof. Requests for re-issuance of any check shall be made to the Debtors by the holder of the Allowed Claim with respect to which such check was originally issued. A request for the re-issuance of a null and void check shall be made on or before the later of (i) the first anniversary of the Effective Date or (ii) within 90 days after the date of issuance of such check. After such date, the Allowed Claim of any holder with respect to such null and void checks shall be treated as forever barred and discharged.

8.9.    <u>No Payments Pending Allowance</u>. The Debtors shall not make any payments to the holder of a Disputed Claim unless and until its amount is determined as an Allowed Claim by order of the Bankruptcy Court.

8.10.    <u>De Minimis Payments</u>. The Debtors shall not be required to make any payment of less than $25 to any holder of an Allowed Claim unless such payment is the final payment for such Claim.

8.11.    <u>Setoff</u>. In the event that the Debtors have a claim against the holder of an Allowed Claim, the Debtors may setoff against the Allowed Claim, subject to § 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of a Claim under this Plan shall constitute a waiver or release by the Debtors of any claim that the Debtors have against the holder of an Allowed Claim. No holder of an Allowed Claim, however, shall be able to setoff, suspend, freeze, or recoup any amount from funds and other payments that such holder may owe to the Debtors. **THE CONFIRMATION ORDER SHALL CONSTITUTE AN INJUNCTION PREVENTING SUCH SETOFF, SUSPENSION, FREEZE, OR RECOUPMENT.**

8.12.    <u>Claims Bar Date</u>.  Unless otherwise provided in this Plan, pursuant to Bankruptcy Rule 3003(c)(3) and § 502(b)(9) of the Bankruptcy Code, the Claims Bar Date shall be the date that is 45 days after the Confirmation Order is entered, unless this Court enters an Order Setting the Bar Date at another time, in which case the Bar Date set by the Court will govern. All proofs of claim filed against the Debtors' Estates must substantially conform to Official Bankruptcy Form B410, and must be received by the clerk of the Court on or before the Claims Bar Date. Each proof of claim must (1) be written in English; (2) denominate the claim in lawful currency of the United States; (3) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (4) include supporting documentation (or, if such documentation is voluminous,

include a summary of such documentation) or an explanation as to why such documentation is not available. Any holder of a Claim against the Debtors who is required but fails to file a proof of claim in accordance with this Section 8.12 on or before the Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors' Estates (or filing a proof of claim with respect thereto), and the Debtors and their Estates shall be forever discharged from any and all indebtedness or liability with respect to such Claim, and such holder shall not be permitted to participate in any distribution in the Debtors' Chapter 11 Cases on account of such Claim, or to receive further notices regarding such Claim. Upon entry of the Confirmation Order or upon Order of this Court establishing a Claims Bar Date, the Debtors will send a separate Notice of Claims Bar Date to all creditors and parties-in-interest so that the Claims Bar Date is conspicuous and known by creditors.

8.13.   <u>Treatment of Late-Filed Claims</u>. No Late-Filed Claim shall be entitled to any distributions under this Plan. This Plan shall constitute an objection by the Debtors to all Late-Filed Claims, including without limitation, late-filed Secured Claims, Administrative Claims (other than Administrative Claims incurred pursuant to §§ 327 and 330 of the Bankruptcy Code), Priority Unsecured Claims, and Unsecured Claims pursuant to § 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3007. The Confirmation Order shall be deemed to be an order authorizing the disallowance of all Late-Filed Claims in full, which shall forever be discharged barred and discharged

### ARTICLE IX.
### Resolving Disputed Claims Under this Plan

9.1.   <u>Objection Deadline</u>. The Debtors shall file with the Bankruptcy Court and serve all objections to Claims within 180 days of the Effective Date of this Plan, unless extended by order of the Bankruptcy Court.

9.2.    <u>Prosecution of Objections to Claims</u>. Expect as otherwise ordered by the Bankruptcy Court, the filing, litigation, settlement, or withdrawal of all objections to Disputed or Undetermined Claims after the Effective Date of this Plan will be performed by the Debtors.

9.3.    <u>Voting Rights of Holders of Disputed Claims</u>. Pursuant to Bankruptcy Rule 3018(a), the holder of a Disputed Claim will not be counted for the purpose of voting on this Plan to the extent it is disputed, unless after notice and hearing, the Bankruptcy Court enters an order temporarily allowing the Disputed Claim for voting purposes. The denial of voting rights herein shall not prejudice the holders of Disputed Claims seeking to have their Disputed Claims allowed for purposes of payment under this Plan.

**ARTICLE X.**
**Provisions Governing Executory Contracts**

10.1.    <u>Rejected if not Assumed</u>. Any Executory Contract not expressly assumed shall be deemed rejected. Nothing herein, however, shall be deemed to extend any deadline previously set by the Bankruptcy Court for filing a Claim against the Debtors and any Claim for rejection damages must be filed no later than 30 days after entry of the Confirmation Order. Failure to file such a Claim shall result in the denial of a holder's Claim for rejection damages, which shall be treated as forever barred and discharged.

10.2.    <u>Objection to Rejection</u>. Any party to an Executory Contract that is being rejected herein shall file with the Bankruptcy Court and serve on the Debtors and their counsel any objection to such rejection within ten days prior to the Confirmation Hearing. Failure to timely file such an objection shall be deemed consent to rejection of the Executory Contract.

**ARTICLE XI.**
**Conditions Precedent to Effective Date of this Plan**

11.1.    <u>Conditions Precedent to Effective Date of this Plan</u>. This Plan shall not become effective unless and until the Effective Date occurs. The Effective Date is subject to the following

24

conditions precedent: (i) the Confirmation Order shall become a Final Order and (ii) the Debtors and their counsel have received all authorizations, consents, approvals, rulings, opinions, and documents that are necessary to implement this Plan.

11.2.  <u>Waiver of Conditions</u>. The conditions precedent to the Effective Date set forth in 11.1 may be waived, in whole or in part, by the Debtors and their counsel, at any time, without notice, and without an order from the Bankruptcy Court or any other affirmative action other than proceeding to consummate this Plan. The failure of the Debtors and their counsel to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE XII.
## Effect of Confirmation of this Plan

12.1.  <u>No Discharge</u>. As provided by § 1141(d)(3)(A) of the Bankruptcy Code, the Confirmation Order shall not discharge the Debtors from any debt or liability that arose before the Confirmation Date.

12.2.  <u>Injunctions</u>. **EXCEPT AS PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS OR ENTITIES WHO HAVE HELD, CURRENTLY HOLD, OR MAY HOLD A DEBT OR CLAIM, OTHER THAN A PROFESSIONAL FEE CLAIM OR A CLAIM FOR ADMINISTRATIVE EXPENSES THAT AROSE BEFORE THE EFFECTIVE DATE ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH DEBT OR CLAIM: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING AGAINST THE DEBTORS OR AGAINST THE DEBTORS' ASSETS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT,**

AWARD, DECREE, OR ORDER AGAINST THE DEBTORS OR AGAINST THE DEBTORS' ASSETS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST THE DEBTORS OR AGAINST THE DEBTORS' ASSETS; (IV) ASSERTING ANY SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO THE DEBTORS OR AGAINST THE DEBTORS' ASSETS; AND (V) COMMENCING OR CONTINUING ANY ACTION, IN ANY MANNER, IN ANY PLACE THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THIS PLAN OR THE CONFIRMATION ORDER. THE CONFIRMATION ORDER SHALL CONSTITUTE SUCH AN INJUNCTION. ANY PERSON OR ENTITY INJURED BY ANY WILLFUL VIOLATION OF SUCH INJUNCTION SHALL RECOVER ACTUAL DAMAGES, INCLUDING ATTORNEYS' FEES AND COSTS, AND, IN APPROPRIATE CIRCUMSTANCES, MAY RECOVER PUNITIVE DAMAGES FROM THE WILLFUL VIOLATOR.

12.3.  <u>Exculpation and Release</u>. The Debtors and their retained professionals, including their counsel, accountants, and financial advisors shall not have or incur any liability to any holder of a Claim or Interest for any act, event, or omission in connection with, or arising out of, these Chapter 11 Cases, the confirmation of this Plan, the Consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, except for willful misconduct or gross negligence. This exculpation and release shall be effective on the Effective Date of this Plan, without further need of documentation.

## ARTICLE XIII.
### Retention of Jurisdiction

13.1.   <u>Scope of Jurisdiction</u>. The Bankruptcy Court, to the extent permitted by the Bankruptcy Code, Bankruptcy Rules, and applicable law shall retain and have jurisdiction over this Plan and all related matters pursuant to 28 U.S.C. § 157 and 1334.

13.2.   <u>Failure of Bankruptcy Court to Exercise Jurisdiction</u>. If the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to these Chapter 11 Cases, including the matters set forth in Section 13.1 of this Article, such abstention shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by other Courts with respect to such matters.

## ARTICLE XIV.
### Modification of Plan

14.1.   <u>Modification of Plan</u>. Modification of this Plan may be proposed in writing by the Debtors and their counsel at any time prior to the Confirmation Date, provided that this Plan, as modified, meets the requirements of §§ 1122 and 1123 of the Bankruptcy Code and that the Debtors and their counsel have complied with § 1125 of the Bankruptcy Code. This Plan may be modified at any time after the Confirmation Date and before substantial consummation as provided by § 1101(2) of the Bankruptcy Code by the Debtors and their counsel, provided that: (i) this Plan, as modified, meets the requirements of §§ 1122 and 1123 of the Bankruptcy Code; (ii) the Bankruptcy Court, after notice and hearing, confirms this Plan as modified under § 1129 of the Bankruptcy Code; and (iii) the circumstances warrant such modification. A holder of a Claim that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes his or her previous acceptance or rejection.

## ARTICLE XV.
### Miscellaneous Provisions

15.1.   <u>Construction and Interpretation</u>. This Plan is a complete, whole, and integrated statement of the binding agreement between the Debtors and their creditors, equity holders, and parties-in-interest upon the matters contained herein. The capitalized terms used herein shall have their respective meanings as set forth in Article III. Terms not defined shall have their meanings given to them by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, unless the context requires otherwise. In the event that terms are not defined in the foregoing authorities, the terms shall be given their ordinary dictionary meaning consistent with modern usage. The use of the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular article, section, subsection, or clause contained herein. Words denoting the singular in number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The headings and table of contents contained herein are for convenience only and shall not limit or otherwise modify this Plan.

15.2.   <u>Plan Documents</u>. All exhibits and schedules hereto, whether they are submitted herewith or subsequently filed with the Bankruptcy Court, are incorporated into this Plan by this reference as though they were typed verbatim herein.

15.3.   <u>Payment or Performance Dates</u>. If the date for any payment or other performance due under this Plan shall fall on a Saturday, Sunday, or any other day which is not a business day, then the due date shall be extended to the next business day.

15.4.   <u>Captions</u>. Captions used in this Plan are for convenience and shall not affect the construction of this Plan.

15.5.   <u>Post-Confirmation Professional Fees</u>. Fees and expenses for professional services rendered to Debtors, subsequent to the Confirmation Date, shall not be subject to application and approval by the Bankruptcy Court.

15.6.   <u>Insurance</u>. Confirmation of this Plan shall have no effect on insurance policies of the Debtors.

15.7.   <u>Post-Confirmation Reports and United States Trustee Fee Payment</u>. Debtors shall be responsible for the timely payment of disbursement fees incurred pursuant to 28 U.S.C. § 1930(a)(6). After Confirmation, Debtors will file quarterly operating reports with the Court until Consummation of this Plan, with the form of such reports being mutually agreed upon by the Debtors and the United States Trustee.

15.8.   <u>Binding Effect of Plan</u>. This Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims, and their respective successors and assigns; provided, however, that if this Plan is not confirmed, this Plan shall be deemed null and void and nothing contained herein shall be deemed to: (i) constitute a waiver or release of any Claims by the Debtors or any other person; (ii) prejudice in any manner the rights of the Debtors or any other party-in-interest; or (iii) constitute an admission by the Debtors or any other party-in-interest.

15.9.   <u>Governing Law</u>. Unless a rule of law or procedure is supplied by federal law, including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules, the laws of the state of Oklahoma shall govern the construction and implementation of this Plan and any agreements, documents, and instruments executed in connection with this Plan or these Chapter 11 Cases.

15.10.   <u>Severability</u>. In the event that a provision herein is found unenforceable by the Bankruptcy Court, Debtors and their counsel may modify this Plan to remedy the problem or conflict. Such a determination of unenforceability shall not limit or effect the enforceability of any

other provisions contained herein or require the re-solicitation of any acceptance or rejection of this Plan.

      15.11.  <u>Closing the Case</u>. Upon closing of all transactions anticipated on the Effective Date of this Plan, this Plan shall be deemed substantially consummated. Upon motion made, a Final Decree shall be entered by the Bankruptcy Court. The Bankruptcy Court may close these Chapter 11 Cases, but retain jurisdiction to decide: (i) any pending adversary proceedings; (ii) applications and contested matters, including remands from appeals; (iii) any pending objections to Disputed Claims or the allowance thereof, including disputes with respect to the classification, priority, estimation, or payment of such Claim; and (iv) any and all pending applications filed by Professional Persons.

      Dated this 1st day of October, 2019.

MCDONALD & METCALF, LLP

*/s/ Gary M. McDonald*

By: _____
Gary M. McDonald, OBA No. 5960
Chad J. Kutmas, OBA No. 19505
Mary E. Kindelt, OBA No. 21728
15 E. Fifth Street, Suite 1800
Tulsa, OK 74103
(918) 430-3770
(918) 430-3770 (Fax)
gmcdonald@mmmsk.com
ckutmas@mmmsk.com
mkindelt@mmmsk.com
*Attorneys for the Debtors*